## UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF ILLINOIS
## EASTERN DIVISION

| | | |
|---|---|---|
| ANDRE RICHARDSON, | ) | |
| | ) | |
| Petitioner, | ) | |
| | ) | No. 16 C 7422 |
| v. | ) | |
| | ) | Judge Thomas M. Durkin |
| SCOTT THOMPSON, | ) | |
| | ) | |
| Respondent. | ) | |

## MEMORANDUM OPINION AND ORDER

On July 20, 2016, Andre Richardson filed a petition for writ of habeas corpus pursuant to 28 U.S.C. § 2254 challenging his 2005 first-degree murder conviction. R. 1. Richardson filed an amended petition on May 17, 2017. R. 24. Respondent Warden Scott Thompson argues that Richardson's amended petition should be denied because it is untimely and the claims raised are procedurally defaulted and without merit. R. 26; R. 50. In addition to briefing its merits, the parties separately briefed Richardson's motion to equitably toll the time for filing his petition.[1] R. 45. For the following reasons, the Court grants Richardson's motion for equitable tolling, but holds its ruling on the merits of his petition pending limited discovery and an evidentiary hearing as outlined below.

---

[1] The parties also separately briefed: (1) whether and how the Seventh Circuit's decision in *Dassey v. Dittman*, 877 F.3d 297 (7th Cir. 2017) (*en banc*) impacts the merits of Richardson's petition; and (2) whether there is a need for an evidentiary hearing on Richardson's ineffective assistance of counsel claim. Both issues are addressed *infra*.

**Background**

**I.     Underlying Facts**

On February 9, 2001, Richardson was investigated and arrested regarding the death of his eleven-month-old daughter, Diamond. At the time of his arrest, Richardson was a mentally challenged sixteen-year-old. Richardson does not dispute that his actions resulted in his daughter's death. However, he argues that he did not act with the intent necessary for a first-degree murder conviction. *See generally* R. 24 and R. 29.

On February 8, 2001, Richardson picked up his daughter from his mother's home so she could stay with him over the weekend. As he bathed Diamond that evening, she slipped and hit her head in the bathtub. Richardson believed Diamond was fine, and they went to sleep after her bath.

The next morning, while eating breakfast, Diamond began eating cereal that had fallen on the ground. Richardson hit her hand to stop her. When Diamond tried eating off the floor again, Richardson bit her. After finishing her breakfast, Diamond's belly was full and poking out. Richardson tried pushing it back in. Diamond threw up some of her food, and Richardson struck her on the ribs. Ten-year-old James Franklin, who was also in the apartment that day, testified that Richardson also hit Diamond on the butt with a coat hanger. Afterwards, Richardson cleaned Diamond up and changed her clothes. Diamond threw up again, and this time Richardson smacked her on the face. Then he placed her in a corner where Richardson ordered

her to stay. Richardson spanked Diamond on her diaper when she moved, and later slapped her hand.

Around that time, Diamond fell and hit her head. She got back up, but then lost consciousness. Richardson picked up Diamond, and began shaking her and calling her name, telling her to wake up. While shaking her, Diamond hit her head on a window pane and a window sill. Then, Richardson tried splashing water on Diamond's face, but she still would not wake up. Richardson sent Franklin to get help from a neighbor. The neighbor called 911 after finding Diamond unconscious. Richardson gave Diamond CPR, but she remained unresponsive.

Diamond was taken to the hospital, where she later died. The medical examiner who performed the autopsy determined that her cause of death was multiple injuries due to an assault. Reporting Officer Michal Hayes saw Richardson crying as the ambulance took his daughter away. Richardson told Officer Hayes that Diamond had fallen in the tub the night before and that he had beaten her for throwing up cereal. Officer Hayes drove Richardson to the hospital, where he later arrested Richardson for child abuse.

Richardson was taken to the Second District police station around 3:35 p.m. Sometime between 5:00 p.m. and 8:00 p.m. that evening, Richardson was physically attacked by a police employee, causing a black eye and swollen face. Richardson told Michael Nolan, a youth investigator assigned to investigate Diamond's case, that he had been struck in the face by lockup personnel. He also told Detectives Edward O'Connell and John Zalatoris about the attack. The police department's Office of

Professional Standards opened an investigation into the attack. It is unclear from the record how the investigation was resolved.

After the attack, Richardson was interrogated three times in a thirteen-hour period. His interrogations began the evening of his arrest and continued into the following morning. The first interrogation took place around 9:00 p.m. in a small, windowless room. Investigator Nolan read Richardson his *Miranda* rights. The interrogation was led by Detectives O'Connell and Zalatoris, but Investigator Nolan also asked Richardson questions. In addition to the detectives and Investigator Nolan, Richardson's mother was also present during that first interrogation, which lasted approximately forty-five minutes. Richardson made an inculpatory statement during that time, the details of which are not reflected in the record. Shortly thereafter, the detectives summoned Assistant State's Attorney John Heil.

Around 12:30 a.m., ASA Heil began interrogating Richardson in the same small, windowless room where he had remained since the first interrogation. At this point, Richardson had been in custody for nine hours. He had not slept or received medical attention for his injuries. Richardson's mother, Investigator Nolan, and Detective O'Connell were all present for this second interrogation. ASA Heil advised Richardson of his *Miranda* rights. He also informed Richardson that Diamond had died from her injuries. Nobody told Richardson (or his mother) that he would be charged with murder. Richardson made a second confession during this interrogation, lasting between thirty and forty-five minutes and describing his interactions with Diamond on the day of her death. According to Heil, Richardson explained how the

night before he had picked her up from her mother's house to babysit her, and that she fell and hit her head. He said that the next morning he gave her cereal and hit her several times when she dropped it on the floor, poked at her stomach afterward causing her to vomit, struck her for vomiting, and struck her numerous times with a plastic hanger and then with a belt for continuing to vomit. He then explained that he put her in the corner and punished her by hitting her when she turned to look at him because he had told her not to, and then told her to go stand against the wall. When she fell, he picked her up and shook her hard, and she hit her head twice—once on the windowsill and once on the window casing. When she was unresponsive, he asked a neighbor to call the police. After this confession Investigator Nolan and Officer O'Connell were excused from the room and ASA Heil had an unrecorded discussion with Richardson. According to ASA Heil, at this time, Richardson told him that the earlier physical attack did not influence his confession, and that since the attack he had been treated fine by those involved in the interrogation process. At the conclusion of this interrogation, ASA Heil explained to Richardson his options for memorializing his statements. Richardson chose to give a videotaped statement. At trial, ASA Heil admitted that during the interrogation he had not kept notes of either his questions or Richardson's responses, and nor had he provided Richardson with a paper and pen or pencil to record what happened.

Richardson's final interrogation and videotaped statement began around 9:30 a.m. that same morning. Richardson had slept 2 or 3 hours before that. Richardson's mother, Investigator Nolan, Detective O'Connell and ASA Heil were all present. At

the beginning of the videotaped statement, ASA Heil again advised Richardson of his *Miranda* rights. When asked if he knew what it meant to say that "anything you say can be used against you in a court of law," Richardson answered, "Whatever I say, I will tell and say it in court." In response, ASA Heil repeated "And some – it could be used against you in court? Do you understand that?" Richardson responded "yes," and Heil went on with the interrogation. Richardson confessed a third time on videotape.

## II. State Court Conviction

Before trial, Richardson's attorney filed a motion to suppress Richardson's confession arguing among other things that Richardson's "physical, mental, educational and/or psychological state, capacity and condition" prevented him from fully understanding his *Miranda* rights. *People v. Richardson*, 917 N.E.2d 501, 505 (Ill. 2009) (*Richardson II*). His attorney, however, did not present any evidence or testimony to support this argument. While Richardson's trial counsel filed several extensions to have Richardson's mental capacity evaluated, an evaluation was never entered into evidence. Additionally, although Richardson's mother was the only witness his attorney called at the motion to suppress hearing, her testimony focused on Richardson's interrogations and the physical attack on Richardson, not on Richardson's mental limitations. The court denied the motion to suppress finding that Richardson's confessions were "freely and voluntarily" given because Richardson was advised of his *Miranda* rights, acknowledged understanding them, and requested neither medical assistance nor a lawyer following his physical attack at the police station.

As a result, the prosecution played the videotaped recording of Richardson's confession to the jury at trial. In his videotaped statement, Richardson confessed that he: struck Diamond on the hand; bit her on the shoulder and stomach; "karate chopped" her ribs; "whooped" her on the butt with a plastic clothes hanger; hit her with a belt; smacked her in the face; and spanked her on her pamper. Richardson also said that his statement had nothing to do with the attack on him; that he was treated fairly; that he was allowed time alone with his mother; that he ate, slept and had access to a restroom; that no threats or promises were made to him or his mother in exchange for the statement. During the defense's case, Richardson testified that the videotaped statement was accurate, except that he did not hit Diamond with a belt.

Richardson's main defense at trial was that he lacked the intent or knowledge to commit first-degree murder. Richardson requested a jury instruction on the lesser-included offense of involuntary manslaughter. The court denied the request, finding that there was no evidence of recklessness. During deliberations, the jury asked the court if they could convict Richardson of a lesser offense. The court denied the jury's request, refusing to give an involuntary manslaughter instruction. The jury returned a verdict that Richardson was guilty of first-degree murder.

The trial court did not learn of Richardson's mental disability and unstable upbringing until after trial. Richardson's Pre-Sentence Investigative Report (PSIR) revealed that Richardson suffered from learning disabilities his entire life, and that he was illiterate at the time of his confession. The PSIR detailed Richardson's limited mental ability and described his troubled upbringing, including that Richardson was

raised without his father, and that his mother had a history of alcohol and drug addiction, and beat Richardson with belts, extension cords and other objects.

The court ordered an examination of Richardson by a court psychologist to determine his fitness for sentencing. As part of this evaluation, Richardson took an IQ test and scored 61. He was ranked in the 0.5th percentile, meaning that 99.5% of his same-aged peers would perform better on the test. Richardson's IQ fell within the extremely low range of intellectual functioning. Due to the results of the IQ test, Richardson was classified as being in the "upper echelon of mild mental retardation." The court nevertheless found Richardson fit for sentencing and sentenced him to a term of forty years' imprisonment.

## III.   Direct Appeal

Richardson appealed, arguing among other things that (1) his confessions should have been suppressed, and that (2) he received ineffective assistance of counsel. *People v. Richardson*, 875 N.E.2d 1202, 1204 (Ill App. Ct. 2007) (*Richardson I*). The appellate court held that Richardson's confessions were coerced, and the case was remanded for a new trial. *Id.* at 1208. The state appealed to the Illinois Supreme Court, which reversed the appellate court's decision in part, finding that Richardson's injuries after the arrest had no effect on his confession, and that, under the totality of the circumstances, his confessions were voluntary. *Richardson II*, 917 N.E.2d at 520-21. The court remanded the remaining contentions. *Id.*

On remand, the appellate court declined to address whether Richardson's counsel had been ineffective, finding the claim was based on extra-record matters

better evaluated on collateral review. *People v Richardson*, 929 N.E.2d 44, 48 (Ill App. Ct. 2010) (*Richardson III*). The appellate court affirmed the lower court's decision on Richardson's other contentions, including that an involuntary manslaughter instruction was not warranted by the evidence. *Id.* at 50. On September 29, 2010, the Illinois Supreme Court denied Richardson's petition for leave to appeal based solely on the trial court's alleged error in not giving an involuntary manslaughter instruction. *People v Richardson*, 938 N.E.2d 528 (Ill. 2010) (*Richardson IV*).

## IV.    State Post-Conviction Proceedings

Consistent with the appellate court's directive in *Richardson III*, Richardson filed a petition for post-conviction relief in the Circuit Court of Cook County on June 15, 2011.[2] He argued that he had ineffective assistance of counsel at trial because his counsel failed to present evidence of Richardson's mental impairment to support the motion to suppress his confessions. Richardson's petition was dismissed. On appeal, the appellate court affirmed, finding that, "[g]iven defense counsel's repeated representations to the court that she needed additional time to have Richardson evaluated, it is obvious that Richardson was, in fact, evaluated and the evaluator reached conclusions not helpful to Richardson's motion to suppress, thus readily explaining the lack of such evidence" at the suppression hearing. *People v Richardson*, 30 N.E.3d 336, 346 (Ill. App. Ct. 2015) (*Richardson V*). The court went on to conclude that even if the confession had been suppressed, there was no

---

[2] Although Richardson was generally represented by counsel for both pre- and post-trial proceedings in state court, he filed his post-conviction petition pro se with the assistance of a fellow inmate.

reasonable probability of acquittal. *Id.* at 343. In a 36-page dissent, Justice Pucinski described the "disastrous ripple effect" that Richardson's trial counsel's failure to introduce evidence of Richardson's mental impairment in support of the motion to suppress had on the trial. *Id.* at 347-383 (Pucinski, J. dissent). On September 30, 2015, the Illinois Supreme Court denied Richardson's petition for leave to appeal. *People v Richardson*, 39 N.E.3d 1009 (Ill. 2015) (*Richardson VI*).

## V.     Federal Habeas Petition

Almost 10 months later on July 20, 2016, Richardson filed a pro se petition for relief pursuant to the federal habeas statute, 28 U.S.C. § 2254. R. 1. The Court appointed counsel on December 7, 2016. R. 12. On May 17, 2017, Richardson filed an amended petition through counsel. R. 24. In his petition, Richardson argues: (1) that he received ineffective assistance of counsel because his counsel failed to submit evidence of his mental deficiencies; and (2) that his confession was coerced and thus involuntary. *See generally* R. 24. Respondent answered the petition, arguing that it should be denied as untimely, and that the claims raised are procedurally defaulted and/or lack merit in any case. *See generally* R. 26. Richardson subsequently filed a motion to equitably toll the time for filing his habeas petition. R. 46.

## Analysis

Because the Court cannot reach the merits unless it concludes that Richardson's petition was timely, the Court will address the parties' equitable tolling arguments first.

## I.    Equitable Tolling

Respondent argues that Richardson's petition is barred because it was filed 97 days late. R. 50 at 10. Richardson acknowledges that his petition was untimely, but argues for equitable tolling. *See generally* R. 46 and R. 58. Equitable tolling is "an extraordinary remedy that is rarely granted." *Carpenter v. Douma*, 840 F.3d 867, 870 (7th Cir. 2016). It is permitted only when the petitioner establishes that: (1) he has been "pursuing his rights diligently;" and (2) "extraordinary circumstances" stood in his way, causing the petition to be untimely filed. *Holland v. Florida*, 560 U.S. 631, 649 (2010). The petitioner bears the burden of demonstrating both elements of the *Holland* test. *Id.* "[T]olling is rare; it is 'reserved for extraordinary circumstances far beyond the litigant's control that prevented timely filing.'" *Socha v. Boughton*, 763 F.3d 674, 684 (7th Cir. 2014) (quoting *Nolan v. United States*, 358 F.3d 480, 484 (7th Cir. 2004)). Nevertheless, equitable tolling determinations are "highly fact-dependent," and courts "employ flexible standards" to resolve the issue on a "case-by-case basis." *Socha v. Pollard*, 621 F.3d 667, 672 (7th Cir. 2010) (citing *Holland*, 560 U.S. at 649-51). Accordingly, courts evaluate "the entire hand that petitioner was dealt" instead of "search[ing] for a single trump card;" "[i]t does not matter that one could look at each of the circumstances . . . in isolation and decide that none by itself required equitable tolling." *Socha*, 763 F.3d at 686.

### A.    Additional Background Facts

The following additional facts are relevant to the resolution of Richardson's equitable tolling motion. Richardson's conviction became final on December 28,

2010—90 days after the denial of the PLA in his direct appeal. Richardson filed his state post-conviction petition 168 days later on June 15, 2011, tolling the running of the limitations period on any federal habeas petition while the state post-conviction petition was pending. *See* 28 U.S.C. § 2244(d)(2) ("The time during which a . . . State post-conviction . . . is pending shall not be counted toward any period of limitation under this subsection."). The tolling ended and the limitation period recommenced on September 30, 2015, when the Illinois Supreme Court denied Richardson's post-conviction PLA. *See Lawrence v. Florida*, 549 U.S. 327, 332 (2007) (Section 2244(d)(2) tolling ends "when the state courts have finally resolved an application for state postconviction relief"). As of that date, 197 days remained in the limitations period. But Richardson did not file his habeas petition until July 20, 2016, 97 days after the April 14, 2016 expiration of the limitations period under Section 2244(d)(1)(A).[3] Richardson offers several reasons for the delay. Each is addressed below.

> **The need for, and difficulty obtaining, assistance with his petition.**

Richardson could not read or write at the time of his arrest in 2001. R. 45, Ex. A ¶ 3. But after attending basic education classes in prison, he was able to improve his reading from a fourth-grade level in 2005 to a fifth-grade level in 2010. R. 45, Ex. A ¶ 3; R. 18, Ex. 3. Ultimately, however, Richardson was unable to pass a test needed

---

[3] It is possible for a habeas petition that is untimely under this section to be timely under Section 2244(d)(1)(B), (C) or (D). But it is the petitioner's burden to demonstrate that one or more of those statutory exceptions apply, and Richardson has not made that argument here. Accordingly, any such argument is forfeited. *See Ramey v. Akpore*, 2014 WL 201843, at *2 (N.D. Ill. Jan. 17, 2014) (petitioner waived argument that statutory exception applied under Section 2244(d)(1)(B)-(D) by failing to raise it (citing *Broadus v. Jones*, 390 Fed. Appx. 804, 807 (10th Cir. 2010)).

to advance to additional classes. R. 45, Ex. N at 38. The prison classes that Richardson did take did not focus on writing, but a cellmate taught him to write, and Richardson subsequently wrote letters to his siblings and to lawyers at the Exoneration Project. He also reads urban novels for pleasure. *Id.* at 38-39, 75, 77-78. Nevertheless, Richardson has difficulty understanding his legal papers even now. R. 45, Ex. A ¶ 3.

Because of his challenges with reading, writing and comprehension, Richardson asked a fellow inmate, Earnell Brown, to prepare his state post-conviction petition, which he filed pro se in 2011. *Id.* ¶ 4. Richardson paid Brown in rice and cups of noodles. *Id.* Although Richardson was concerned about sharing the details of his crime with others out a fear of physical harassment, Richardson felt he could trust Brown because he had a short prison sentence and Richardson "knew he wouldn't talk about my case to other people." *Id.* He nevertheless did not share the details of his case with Brown, and instead merely "had [Brown] copy the legal argument from my direct appeal brief." *Id.*

Richardson was living in Unit E at Stateville when he learned that the Illinois Supreme Court had denied his post-conviction PLA on September 30, 2015. *Id.* ¶ 5. He began to look for someone to help draft his federal habeas petition, but still feared that he may be the target of violence due to the nature of his crime. He also feared violent punishment by members of the Gangster Disciples—a gang he had joined at the age of 12 but left with permission in 2011—if they learned that he had confessed to police in violation of their code of silence. *Id.* ¶¶ 5, 7-9, 11-12. Richardson's mental

13

health records also reflect that he was raped at the age of 17 by a fellow inmate. *See* R. 46, Ex. D at 4 (October 3, 2016 IDOC Evaluation of Suicide Potential form stating "[T]his was when I was at county, I was raped, it happened at Menard too, I have a high profile case and it came up on the news, my cellie beat me and raped me for 2 weeks.") For these reasons, Richardson believed he had to be very careful about who he asked for help. R. 45, Ex. A ¶ 12; R. 46 at 5.

Richardson states that even when he found an inmate he was comfortable approaching for help, the inmate wanted to charge him money he did not have. R. 45, Ex. A ¶ 13. While in Unit E, Richardson sought help from an older "jailhouse lawyer" or "prison litigator" known as "Con," and another inmate known as "Little Mike." *Id.* ¶ 14; R. 45, Ex. N at 11-13, 17. Both men helped Richardson in or about March 2015, when he received Illinois appellate court Justice Pucinski's dissenting opinion in his direct appeal, and was confused by its meaning, initially thinking he had won. R. 45, Ex. A ¶ 14; R. 45, Ex. N at 17. Then, shortly after Richardson learned that the Illinois Supreme Court had denied his post-conviction PLA in September 2015, he asked Con to prepare his habeas petition. At that time he did not have the $50 Richardson says Con requested in order to prepare it. Nor could his mother or brother help with the money.[4] R. 45, Ex. A ¶ 14.

---

[4] In his March 27, 2019 declaration, Richardson stated that he asked other inmates in Unit E for help, but could recall neither their names nor the dates. *Id.* ¶ 16. Then, in his deposition a few days later, Richardson stated that he only sought legal advice from Con and Little Mike while at Unit E. R. 45, Ex. N at 17 ("Them the only guys. I talk with a lot people, but only him and Con for legal advice. That's it.").

Richardson transferred to Unit D in November 2015, where he states he asked "some older inmates" for help with his petition. According to Richardson, most refused "because of the nature of [his] crime," but "Fonz" said he would help if Richardson would give him $150 to $200. And another inmate, "Q", said he would write the petition for $200 to $300 in commissary money or cash. Richardson could not afford either. *Id.* ¶ 15. Richardson stated that he asked other inmates in Unit D for help, but could not recall their names or the dates. *Id.* ¶ 16.

On March 21, 2016, Richardson was transferred out of Unit D and into segregated confinement in Unit F (or, "the F House"), where he remained until he was released to an F House cell on April 21, 2016. Richardson knew his new cellmate, George Cabot, referred to as "Scrappy," from prison classes the two had taken together. *Id.* ¶ 17. Besides Q, who knew about Richardson's case "cause he knew my people from the streets," Richardson says Scrappy was the only inmate who knew the full details of his case. R. 45, Ex. N at 45. Richardson asked Scrappy to prepare his habeas petition. Scrappy told Richardson that he would do it for $100. But when Richardson told him he did not have the money, Scrappy agreed that Richardson could pay him in wine he made from cafeteria food instead. R. 45, Ex. A ¶ 17. Eventually, and about a month after the two men became cellmates, Richardson finished making about 15 bottles of wine to pay off his debt, and Scrappy got to work on his petition. *Id.*; R. 45, Ex. N at 37-38. Scrappy, who had recently filed his own habeas petition, explained to Richardson that his own habeas raised the same issues that were raised in his direct appeal. Richardson asked Scrappy to do the same with

respect to his petition; that is, to copy the issues from Richardson's direct appeal. R. 45, Ex. N at 35-36, 88. Scrappy wrote Richardson's petition while "lying on his stomach on his bed" in their shared cell. R. 45, Ex. A ¶¶ 18, 21. According to Richardson, drafting the petition was difficult for Scrappy, because he had just one arm, and because the F House was dark, extremely loud, "smelled horrible," was sometimes flooded, and there were "bugs everywhere." *Id.* Richardson also claims that inmates "kicked on their doors all day" and "set fire to things," and that he and Scrappy had difficulty thinking and sleeping. *Id.* Ultimately, Scrappy finished Richardson's petition and it was filed on July 20, 2016.[5]

*Law library access and assistance.* Richardson claims to have tried to access the law library several times between October 2015 and March 2016 so that he could get help figuring out his filing deadline, although he does not recall the precise number of requests he made. *Id.* ¶ 19; R. 45, Ex. N at 19. To get library access, inmates wrote their name and the reason they wanted to use the library on a "request slip." If an inmate had a court-ordered deadline, he could include that information on the slip, and his request would be given priority over others without such a deadline. R. 45, Ex. A ¶ 19; R. 45, Ex. T ¶ 6; R. 50, Ex. 1 ¶ 3. Then, the inmate could place the slip in his cell bars for a corrections officer to pick up during mail rounds. R. 45, Ex. A ¶ 19; R. 50, Ex. 1 ¶ 3. The librarian, Ms. Baker, generated a waiting list by living unit. R. 50, Ex. 1 ¶ 3. Inmates could expect to wait between 3 to 5 weeks for a library

---

[5] Richardson's counsel sent Scrappy a letter on January 29, 2019 asking to discuss his role in Richardson's habeas petition, but Scrappy did not respond. R. 45, Ex. Q; R. 46 at 7, n.4.

access pass if they did not have a recorded court-ordered deadline. R. 45, Ex. T ¶ 7; R. 45, Ex. R ¶ 7.

Richardson usually did not hear anything after submitting a request slip. R. 45, Ex. A ¶ 19. Richardson complained to the lieutenant about his lack of library access. R. 45, Ex. N at 19. Ultimately, Richardson got access to the library three times, although he cannot recall the dates. R. 45, Ex. A ¶ 20. Due to security procedures, Richardson's access on each occasion was limited to considerably less than the allotted two hours. R. 45, Ex. O ¶ 14; R. 50, Ex. 1 ¶ 3; R. 45, Ex. T ¶ 8. Once there, Richardson asked Ms. Baker for help finding the habeas statute and cases because of his difficulty reading. But she refused. R. 45, Ex. A ¶ 20. And while Richardson ultimately was able to locate the legal book containing the deadlines and requirements for filing a federal habeas petition with the help of his then-cellmate, the relevant pages were missing. R. 45, Ex. O ¶ 15; R. 45, Ex. N at 58.

When Scrappy agreed to help Richardson in April 2016, the two gathered some case names from "Shotgun," a prison unit law clerk and jailhouse lawyer, as well as the cases cited by Richardson's lawyers in his direct appeal. *Id.* ¶ 21. Scrappy told Richardson he needed to "Shepardize" the cases on the library computer, a term Richardson did not understand at that time. *Id.*; R. 45, Ex. N at 55. But there was only one library computer and it was not for inmate use. R. 45, Ex. N at 56; R. 45, Ex. P at 71. Richardson claims that when he was subsequently granted library access for the second time, he went straight to Ms. Baker for help. But she informed him that "There are 1,000 people ahead of you," and did not help him Shepardize the cases. R.

45, Ex. A ¶ 22. Richardson was not granted access to the library again until late June 2016. He asked Ms. Baker at that point whether she had Shepardized his cases, and she reported that she had not. Ultimately, Scrappy finished the petition and filed it without Shepardizing the cases it cited. *Id.* ¶ 23.

Stateville records regarding library-related requests are largely incomplete. From October 2015 through July 2016, Stateville did not maintain historical records showing waiting lists for library access, copies of legal materials or Shepardized cases. R. 45, Ex. U at 4. Nor can Respondent confirm how often inmates without recorded court deadlines were granted access to the library or provided copying or Shepardizing assistance, the length of the waiting periods for fulfillment of those requests, or how Ms. Baker managed the waiting lists for those requests or decided which inmates to assist. *Id.* There is no list of inmate requests for access to the library or its materials and services. *Id.* In fact, while specific inmate requests for library access, materials or services were sometimes filed, there was no policy requiring that practice and thus some requests were not. *Id.* at 5. Stateville began using an electronic record system in June 2016 to log library passes issued to inmates, but prior to that, library staff did not regularly log such information, and many of the paper records from this period are no longer available. According to the electronic records, Richardson was issued a law library pass on June 24, 2016, but there is no record of the access request that preceded the pass. Respondent acknowledges that the file may not reflect all of Richardson's requests for access or for materials or services that he may have made between October 2015 and July 2016. *Id.* And

Respondent is unable to determine the inventory of books and other legal materials available during the relevant time period, or the condition of those books and materials. *Id.* at 4-5.

**Grievances.** Richardson reports filing two grievances concerning the law library while at the F House. R. 45, Ex. A ¶ 24. The first grievance—written by Scrappy and signed by Richardson in or about late April 2016—concerned his inability to access the library. *Id.* ¶ 25. The grievance process requires grievances to go to the unit counselor as a first step. *Id.* ¶ 26; R. 50, Ex. 2 ¶ 3. This could be accomplished: (1) by handing the grievance directly to the counselor (who makes rounds only every 3-4 weeks); (2) by handing the grievance to a unit law clerk (who makes daily rounds to collect grievances, and then delivers them to the counselor); or (3) through the institutional mail system.[6] R. 45, Ex. A ¶ 26; R. 50, Ex. 2 ¶ 3. Richardson reports that he gave his first grievance to Shotgun, his unit law clerk at the time, who told Richardson that he gave the grievance directly to the counselor. R. 45, Ex. A ¶ 27. Richardson did not receive a response. *Id.* ¶ 28. Richardson estimates that he submitted his second grievance—this time concerning Ms. Baker's refusal to help Sherpardize his cases—around the middle of May 2016. As before, Scrappy

---

[6] While Respondent contends that the grievance policy reflects only options (1) and (3), Richardson testified that option (2) was most typical. *See* R. 50, Ex. 2 ¶ 3 ("Inmates hand the grievance to the counselor or submit it through the institutional mail system."); R. 45, Ex. A ¶ 26 ("Sometimes inmates hand their grievances directly to the unit counselor, but the counselor only makes rounds in the unit every three to four weeks. The more typical process is to give the grievance form to the unit law clerk, who then gives it to the counselor."). The parties agree that the first step in the grievance procedure is to submit the grievance to a counselor.

drafted the grievance and Richardson signed it, and Richardson gave the grievance to Shotgun who confirmed that he placed it in Richardson's counselor's hand. *Id.* ¶ 29. But Richardson never received a response, and Shotgun told him each time he asked that he had not heard anything either. *Id.* ¶¶ 30-31.

Respondent has no record of either grievance. R. 50, Ex. A to Sanders' Dep. at 6. Respondent stipulates that between October 2015 and July 2016, there was no policy or rule requiring counselors to log initial grievances received from inmates, and that unless the counselor took it upon him or herself to record the grievance in that inmate's counseling summary (also called "CHAMPS"), the prison would have no record of it. R. 45, Ex. U at 6. Sytera Sanders, Richardson's assigned counselor from March 2014 to December 2015, reports that her "general practice" was to make a note in CHAMPS whenever she received a grievance. R. 50, Ex. 3 at 1. David Mansfield, Richardson's counselor from July 2015 to June 2016, stated that he tried to but did not always make note of grievances in CHAMPS. R. 45, Ex. R ¶ 12. Respondent stipulates that inmate grievances were sometimes lost in the institutional mail or even destroyed before reaching the inmate's counselor or the grievance office. R. 45, Ex. U at 6; *see also Kyles v. Beaugard*, 2017 WL 4122708, at *4 (N.D. Ill. Sep. 18, 2017) (counselor testified that grievances placed in Stateville's institutional mail were sometimes lost or destroyed).

**Suicide watch, segregated confinement and lockdown.** Richardson reports feeling panicked and depressed while trying to get his habeas petition filed because he could not easily access the library, and when he could, he could not get

the help he needed. He knew that the petition was his "last shot," and threatened to kill himself several times because his "last chance" was "slipping away." R. 45, Ex. A ¶ 32. Richardson was transferred to the health care unit and placed on suicide watch three times for a combined total of 12 days in October 2015, January 2016 and February 2016, and Richardson spent another 21 days on suicide watch while in segregated confinement at the F House in March and April 2016. *Id.* ¶ 33. When Richardson was in the health care unit, he could not access his belongings or legal materials. Nor could he visit the library or make requests for library materials. He also could not communicate with other inmates, including Scrappy, about his petition (or at all). *Id.* ¶ 34; R. 45, Ex U at 2-3. While in segregated confinement, Richardson was permitted to visit the "little" law library, a prison cell that contained only "wet" and "ruined" books. R. 45, Ex. A ¶ 35. There was no one there to help him. *Id.*

In addition to the time Richardson spent in the health care unit and segregated confinement, the prison also was on lockdown for 34 days while Richardson was trying to prepare his petition (5 days in October 2015, 9 days in December 2015, 3 days in March 2016, 4 days in April 2016, 1 day in May 2016, 3 days in June 2016, and 9 days in July 2016). Although Richardson could request library materials while on lockdown, he was unable to seek help from inmates or access his legal materials or the library itself. In fact, Richardson missed a scheduled library visit in spring of 2016 because of a lockdown. R. 45, Ex. A ¶ 36; R. 45, Ex. U at 3.

## B.     Discussion

The Court first analyzes whether extraordinary circumstances existed to prevent Richardson from timely filing his habeas petition, and then whether he pursued his rights diligently. *See Socha*, 763 F.3d at 684 ("We take up the question of extraordinary circumstances first, because [petitioner's] diligence is best evaluated in light of that broader picture.").

### 1.     Extraordinary circumstances

Richardson argues that his intellectual disability and illiteracy, mental illness, lack of access to necessary legal resources or assistance, and the restrictive and inhumane living conditions together constitute "extraordinary circumstances" necessary to justify equitable tolling. The Court discusses each in turn before considering their cumulative effect.

***Intellectual disability, illiteracy, and mental illness.*** Richardson points to his 2005 IQ test results (61), the fact that he reads at only a fifth-grade level, his limited ability to write, and his history of mental illness and suicidal tendencies to demonstrate that he was unable to prepare and file his federal habeas petition without assistance. *See* R. 46 at 14-15; *see also* R. 58 at 4-5, 10-13. The Court notes at the outset that mental incompetence alone can warrant equitable tolling. *Davis v. Humphreys*, 747 F.3d 497, 499 (7th Cir. 2016). But a petitioner must show "something more" than "but-for causation between a prisoner's mental limitations and the failure to timely file." *Davis*, 747 F.3d at 499-500.

The Seventh Circuit has yet to clearly articulate when a mental impairment alone justifies tolling. *See, e.g., Boulb v. United States*, 818 F.3d 334, 340, 342 (7th Cir. 2016). There is no debate that Richardson's mental abilities are impaired. *See* R. 21 at 4 (the Court's February 28, 2017 order noting that "[n]o one disputes Petitioner's IQ or his limited functional capacity"). But Respondent contends that Richardson's evidence of mental limitations falls short of *Davis*'s "something more" standard. First, Respondent relies on *Mayberry v. Dittman*, 904 F.3d 525, 531 (7th Cir. 2018) to argue that Richardson's 2005 IQ test results are too old to be considered in support of his equitable tolling motion. R. 50 at 17-18. But although *Mayberry* also involved an older, low IQ score (petitioner scored 64 approximately 17 years prior), the court's decision turned at least in part on more recent evidence that the petitioner was in fact competent. Specifically, in concluding that the petitioner's mental limitations did not prevent him from "understanding his legal rights and acting upon them" as required for equitable tolling, the court found it important that the petitioner had since filed unassisted motions for a new trial and for post-conviction relief, and a premature habeas petition. *Id.* at 530-31 (quoting *Obriecht v. Foster*, 727 F.3d 744, 748 (7th Cir. 2013)).

In contrast, there has been no suggestion that Richardson has ever filed a court document on his own. And that makes sense; Richardson requires help even with the most basic written tasks, including filling out library request slips. *See* R. 45, Ex. N at 21, 75 (indicating that Richardson merely put his name and inmate number on library request slips, and his cellmates did the rest). Despite Respondent's urging,

nor does the Court find that Richardson's improved reading skills prevent him from claiming mental incompetence. Richardson's improvement by a single grade level occurred over a 6-year period, and ultimately Richardson was unable to pass the test necessary to advance to additional courses. R. 18, Ex. 3; R. 45, Ex. N at 38. Respondent also points out that Richardson wrote letters to his siblings and to the Exoneration Project. But Richardson testified that he did not always receive a response because his letters were difficult to understand. *See* R. 45, Ex. N at 78 (indicating that Richardson's sister did not respond to the content of his letters because she "never really understood [me] . . . it was the writing. You feel me?").[7] Accordingly, Respondent cannot reasonably contend—and offers no evidence that— Richardson's abilities improved to the point necessary to prepare and file his habeas petition on his own.

Next, Respondent contends that the 2005 state court sentencing evaluation precludes Richardson from claiming mental incompetence because despite the low IQ score if reflects, he was found fit for sentencing and to have the ability to improve his diagnosis of mild mental retardation. R. 50 at 18; R. 20, Ex. L at 2-3 (concluding that Richardson "underst[ood] the nature and purpose of the [sentencing] proceedings," and that "Mental Retardation is not necessarily a permanent condition and that with additional education and/or further life experience it is likely that he would shift into the Borderline range of Intellectual Functioning.").

---

[7] Nor did Stateville offer any writing classes or other assistance to Richardson; to the contrary, Stateville officials confiscated the tracing books Richardson's family sent to help him learn the alphabet. R. 45, Ex. N at 74.

The Court notes at the outset Respondent's boldfaced attempt to have its cake and eat it too: Respondent asks the Court on the one hand to discount Richardson's 2005 IQ score as too old to be reliable, but then argues on the other for the reliability of a psychological evaluation completed at that same time. But the Court is not persuaded in any case. First, as discussed, there is no evidence that Richardson's abilities have markedly improved. Second, the Court is not persuaded by Respondent's reliance on the dicta in *Davis v. Humphreys*, 747 F.3d 497 (7th Cir. 2014). The court in *Davis* suggested that a finding that a petitioner is unable to understand the charges against him and the proceedings well enough to assist in his own defense or, in the case of a death penalty proceeding, be executed, serve as a possible standard for whether mental incapacity alone justifies equitable tolling. But the court declined to choose a standard, or even delineate all the possibilities. *See Davis*, 747 F.3d at 500 ("The parties' briefs . . . do not cover that subject thoroughly enough for us to be confident that we understand the range of possibilities—and if we don't know what options are available, we cannot choose intelligently among them."). In any event, unlike the petitioner in *Davis*, Richardson does not argue that his mental limitations alone render his petition worthy of equitable tolling. Thus, the Court will not hold that the 2005 sentencing evaluation precludes Richardson from asserting mental limitations as a possible "extraordinary circumstance" justifying tolling.

Respondent also urges the Court to decline equitable tolling under the standard set forth by the Ninth Circuit in *Stancle v. Clay*, 692 F.3d 948, 958-59 (9th

Cir. 2012), which would require Richardson to show that his "mental impairments render [him] 'unable rationally or factually to personally understand the need to timely file,'" a standard Respondent says he cannot meet. R. 50 at 17. But Respondent neglects to mention that *Stancle* permits a petitioner to demonstrate in the alternative that his "mental state rendered him *unable personally* to prepare a habeas petition and effectuate its filing"—precisely Richardson's contention here. 692 F.3d at 959 (emphasis added). And the Court is dubious of the suggestion that Richardson had the understanding *Stancle* contemplates in any case. Respondent points out that Richardson knew: (1) that he had to file a habeas petition when the Illinois Supreme Court denied his post-conviction PLA in September 2015; (2) that it would be his last opportunity to challenge the conviction; and (3) that a time limit applied. But this rudimentary understanding does not doom Richardson's equitable tolling argument. It was clear as recently as Richardson's April 2019 deposition that he still does not understand how the statute of limitations applied to his case. *See* R. 45, Ex. N at 59-60 (Richardson: "But you telling me I got a year. I been on this appeal 20 years, so it don't make no sense. How I got a year?" Counsel for Respondent: "I understand it can be confusing.").

Respondent nevertheless maintains that Richardson has a "relatively sophisticated understanding of federal habeas law" and the "mental capacity to understand and act on his legal rights." R. 50 at 18-20. Respondent points out that Richardson told the inmates who helped prepare his state post-conviction petition and his federal habeas petition which issues to raise, and to copy the arguments from

his previous filings. *Id.* at 19-20. The Court agrees that this testimony suggests that Richardson had some idea of the universe of arguments to raise in his petition. But the Court cannot agree that Richardson had the ability to *act* on his rights, even assuming he did have the mental capacity to understand them as Respondent contends (which the Court doubts).[8]

Respondent also takes aim at the mental health records reflecting Richardson's psychiatric treatment at Stateville for suicidal tendencies, depression, and psychosis, arguing that they are filled with hearsay and do not demonstrate that Richardson could not understand his rights even assuming that he suffers from the illnesses they identify. R. 50 at 18. Further, Respondent contends that the Court cannot decipher the records "without the benefit of expert testimony," which Richardson has not offered. *Id.* Respondent's hearsay arguments are resolved *infra.* Here, it is enough to note that the records reflect that Richardson was placed on suicide watch on multiple occasions during the relevant period, and was prescribed antipsychotic medications by Stateville psychiatrists. The Court requires no expert testimony on these points, which it finds compelling on the present issue. *See generally* R. 46, Exs. D-M; *see also*

---

[8] The unrebutted testimony Respondent elicited during Richardson's April 2019 deposition was that Richardson was unable and remains unable to sufficiently understand legal concepts, and could not prepare and file his federal habeas petition. *See, e.g.*, R. 45, Ex. N at 76 (explaining that Richardson did not understand that he had lost on direct appeal after receiving Justice Pucinski's dissenting opinion); *id.* at 59-60 (explaining that Richardson did not understand how the statute of limitations applied to his case); *id.* at 76-77 (explaining that Richardson had difficulty understanding legal words and the law, and struggled with reading comprehension: "just 'cause you read it, you don't understand it. You can't really grasp onto it.").

*Obriecht*, 727 F.3d at 750-51 (mental illness tolls the limitations period if the illness "*in fact* prevents the sufferer from managing his affairs" (emphasis in original)).

In sum, even if Richardson's deposition testimony, sentencing evaluation, reading assessments and mental health records regarding Richardson's mental limitations alone do not qualify as "extraordinary," the same evidence taken together demonstrates that Richardson's mental limitations during the relevant time period were substantial enough to be considered in the equitable tolling analysis.

**Inadequate resources and law library access.** Richardson contends that his difficulty accessing the law library and Ms. Baker's failure to assist him with his requests also should be considered in the "extraordinary circumstances" analysis. Lack of law library access is a substantial factor in determining whether extraordinary circumstances exist to justify equitable tolling, and may also permit statutory tolling.[9] *See Sanchez v. Gaetz*, 988 F. Supp. 2d 858, 864 (N.D. Ill. 2013) (petition timely under either equitable tolling or Section 2244(d)(1)(B) where petitioner "effectively lack[ed] [ ] a law library," had difficulty with English, received no help from library staff and was "entirely dependent" on a fellow inmate); *see also Estremera v. United States*, 724 F.3d 773, 777 (7th Cir. 2013) (joining other circuits in holding that "lack of library access" may "allow[ ] more time under § 2255(f)(2)");

---

[9] Richardson does not contend that he meets the requirements for statutory tolling under Section 2244(d)(1)(B), which provides that the one-year limitation period for a federal habeas petition starts to run on "the date on which the impediment to filing an application created by State action in violation of the Constitution or laws of the United Sates is removed, if the applicant was prevented from filing but such State action."

*Tijerina v. Butler*, 2015 WL 920672, at *2-3 (N.D. Ill. Feb. 27, 2015) (ordering evidentiary hearing on equitable tolling for illiterate petitioner subject to lockdown and facing lack of "legal assistance," "including insufficient library access").

The unrebutted testimony and stipulations leave little doubt that Richardson had difficulty accessing the library and its services. Indeed, and as Respondent admits, Stateville records regarding requests for library access and services, and regarding actual access and assistance, are incomplete. And the record is clear that even when an inmate *was* granted library access, that access was brief and, absent a known court-ordered deadline, delayed and infrequent. But while Respondent does not seriously dispute Richardson's difficulty accessing the library and its services, Respondent argues that Richardson has not shown a need for such access and assistance. Respondent points out that the form habeas petition instructs prisoners to describe claims "*without* citing cases or law." R. 50 at 21 (citing R. 1 at 5 (emphasis added)). But this argument fails. "Filing a [habeas] petition without research is risky; a good claim may be lost as undeveloped, or a bad claim may be advanced and rejected, blocking relief on a good claim later." *Estremera*, 724 F.3d at 776 (stating that the position that all a prisoner need do is narrate the facts in his petition incorrectly "supposes that 'fact' and 'law' can be neatly separated. They can't."). Indeed, "[p]risoners who file collateral attacks without doing legal research face two dangers. First, the district judge may dismiss the petition summarily on screening . . . . Second, a prisoner who files [a habeas petition] based on a bad legal theory may

doom his chance to prevail on a good one." *Id.* Accordingly, the Court declines to hold as a matter of law that library access is unnecessary for a federal habeas petition.

Respondent nevertheless contends that Richardson failed to explain how additional library access would have expedited or affected the ultimate filing in his case, since the substance of his petition was copied largely word-for-word from Richardson's state court filings. R. 50 at 21. The Court will not fault Richardson simply because Respondent effectively forced him to file his petition without library access or research. Indeed, because of his lack of access and assistance, Richardson was neither able to ascertain and understand the statute of limitations, nor Shepardize the cases his petition ultimately cited. Accordingly, the Court will consider Richardson's effective lack of library access and assistance alongside the other circumstances Richardson presents.

*Lockdowns, hospitalization, confinement and prison conditions.* Richardson argues that the 78 days he spent hospitalized or in lockdown, segregated confinement, protective custody or administrative detention while attempting to file his petition also prevented its timely filing. R. 46 at 17-18; R. 58 at 15. Richardson points to the stipulated evidence that access to legal materials and the ability to communicate with others and do legal work was limited if not completely unavailable during this time. In response, Respondent argues that because 33 of those 78 days occurred after the expiration of the statute of limitations, they have "no bearing" on the tolling question. R. 50 at 21-22. Respondent is correct on the numbers, but wrong on the implication. Indeed, before the Court can invoke equitable tolling to save a

30

claim, it must determine the length of time in which to toll the applicable limitations period. *See Haynes v. Indiana Univ.*, 902 F.3d 724, 731 (7th Cir. 2018) (holding in Title VII case that equitable tolling "is appropriate only for a length of time within which it would have been reasonable to file a complaint," and "we will not grant an automatic extension of indefinite duration."). Richardson's limited access to his materials and assistance—before and after the statute of limitations expired—is relevant to this inquiry.

Respondent also argues that Richardson fails to explain how the 45 days preceding the expiration of the statute of limitations delayed his filing, pointing out that Richardson's petition was filed while he was in segregation. R. 50 at 22. Placement in segregation is not enough by itself to qualify as extraordinary circumstances, but such segregation, like Richardson's mental limitations and lack of law library access and assistance, "may serve as a piece of the puzzle." *See Socha*, 763 F.3d at 685 ("We are not worried that prisoners will vie to be put in segregation just so that they can secure extensions of the one-year limitations period."). Here, it is enough that Richardson lacked access to legal materials and was limited in his ability to do legal work during that time. R. 58 at 15 (citing R. 45, Ex. U). Respondent does not dispute this representation. That Richardson's petition ultimately was filed during a period of segregation does not negate those facts.

Richardson also contends that the inhumane prison conditions at the F House—where he spent the last 25 days of the limitations period (and then some) in segregated confinement, and the remainder of his time until his petition was filed—

affected him and Scrappy, depriving them of sleep and the ability to focus on the petition. Richardson appropriately describes the F House as "violent," "chaotic," and "filthy." R. 46 at 21-22 (citing R. 45 Ex. A ¶ 18). Respondent is noticeably silent on this point in his brief, but stipulated that the F House was closed because of "safety and operational hazards" and was "not fit for human habitation." R. 45, Ex. U at 1-2. This evidence is sufficient to include the F House conditions in the Court's "extraordinary circumstances" analysis. *See Carpenter*, 840 F.3d at 872 (explaining that "garden variety" complaints about prison life are insufficient taken alone to qualify as extraordinary, but their cumulative effect must be considered to determine whether they truly prevented timely filing).

*    *    *    *    *

The Court concludes that the circumstances Richardson faced during the limitations period taken together—including his mental limitations and health, illiteracy, difficulty accessing legal resources and assistance in preparing his petition, poor living conditions at the F House, and time spent without access to legal materials and/or assistance, as well as the fact that Richardson was unrepresented for the entirety of the limitations period—were "extraordinary." *See Socha*, 763 F.3d at 685 (noting that "[t]he important thing is the full picture with which an inmate is contending," and while "lack of representation is not on its own sufficient to warrant equitable tolling," that a petitioner "was unrepresented for the entire period relevant to [the equitable tolling] inquiry" is "worth noting").

## 2. Diligence

Nevertheless, equitable tolling will not lie absent demonstrated diligence by the petitioner. *Holland*, 560 U.S. at 649. "The diligence required for equitable tolling purposes is reasonable diligence . . . not maximum feasible diligence." *Id.* at 653 (quotations omitted). And a petitioner's diligence is evaluated in light of the extraordinary circumstances he faced. *Socha*, 763 F.3d at 684 (petitioner's "diligence is best evaluated in light of that broader picture" of the extraordinary circumstances faced).

Here, Richardson argues that he was sufficiently diligent in preparing and filing his habeas petition and throughout the state court proceedings. He contends that he "sought to vindicate his constitutional rights" through "seven state court proceedings" and "began trying to prepare his [federal habeas] Petition immediately after the Illinois Supreme Court denied his last appeal" in September 2005. R. 46 at 18-19; R. 58 at 2. He cites his attempts to contact public defenders from his state court proceedings, to get help from attorneys at the Exoneration Project, and to get help from several fellow inmates despite that he had been beaten and repeatedly raped by one inmate, his fear of retribution from his former gang if the members learned of his confession, his fear of further physical harassment due to the nature of his crime, and his transfer to different living units and time spent on lockdown, in isolation, or in the health unit during and after the limitations period. R. 46 at 19-20; R. 58 at 2-10.

Richardson alleges that he was equally persistent in pursuing library access, claiming to have checked in with the law library each week despite routinely being denied access because he could not prove a pending due date. R. 46 at 19-20; R. 45, Ex. O ¶ 13. He states that he complained to the unit lieutenant and to the librarian when access was not provided, and ultimately asked his cellmate to draft two grievances on his behalf when the librarian continued to refuse help. R. 46 at 20. In sum, Richardson contends "[h]e did everything he could think of to file his Petition and get a fair trial." *Id.* at 20. Respondent nevertheless takes issue with Richardson's efforts both before he filed his state post-conviction petition, and after his post-conviction PLA was denied. The Court addresses each period below.

***Efforts prior to state post-conviction petition.*** First, citing *Pace v. DiGuglielmo*, 544 U.S. 408 (2005), Respondent argues that Richardson's failure to file his state post-conviction petition until 168 days after his conviction became final "alone defeats [Richardson's] claim." R. 50 at 11-13. Respondent argues that Richardson's "only excuse" is that he was unaware that the statute of limitations had commenced on his *federal* petition, an excuse Respondent contends fails. R. 50 at 12-13 (citing *Davis v. Humphreys*, 747 F.3d 497, 499 (7th Cir. 2014) ("prisoners' shortcomings of knowledge about the AEDPA or the law of criminal procedure in general do not support tolling")). But this contention ignores the circumstances that the Court has determined were extraordinary enough to prevent timely filing. And *Pace* is distinguishable on that and other grounds. In *Pace*, the petitioner filed his state post-conviction petition late "without any justification," and waited an

additional five months after those proceedings became final before filing his federal habeas petition. *Pace*, 544 U.S. at 419. Here, in contrast, not only was Richardson's state post-conviction petition timely filed, but as discussed, Richardson faced a whole host of circumstances that affected the timeliness of his federal petition, none of which were present in *Pace*. *See id*. at 418 (petitioner's offered "extraordinary circumstances" limited to his confusion over whether he must file state petition first). For the same reasons, *Smith v. Akpore* also is inapposite. *See* 2014 WL 4635164, at *3 (N.D. Ill. Sep. 15, 2014) (tolling not available to petitioner who filed untimely state court petition and failed to produce evidence of any extraordinary circumstances (or argue for equitable tolling at all)).

Respondent's reliance on *Simms v. Acevedo*, 595 F.3d 774 (7th Cir. 2009) and *Ramey v. Akpore*, 2014 WL 201843 (N.D. Ill. Jan. 17, 2014) is also misplaced. In *Simms*, the petitioner withdrew his initial state court habeas petition, and waited nearly a year to file his second attempt before ultimately filing an untimely federal petition. *Simms*, 595 F.3d at 781. The court found "no extraordinary reason" requiring equitable tolling, reasoning that the petitioner's lack of diligence at the state court level meant that he also "failed to act diligently in pursuing his federal rights." *Id*. But *Simms* is easily distinguished; none of the circumstances present here were present in *Simms*, and nor was Richardson's state petition as delayed.

*Ramey* is also distinguishable. There, 6 months passed between the date on which the petitioner's conviction became final, and the date on which the petitioner filed his state post-conviction petition, and then almost a full year passed between

the date the state post-conviction proceedings concluded and the date the petitioner ultimately filed his federal habeas petition. The petitioner failed to argue for equitable tolling or present evidence of extraordinary circumstances. Accordingly, the court concluded that there was "no basis in the record" to excuse the petitioner's delay on either end of the proceedings. *See Ramey*, 2014 WL 201843, at *4. Here, in contrast and as outlined *supra*, Richardson offers several reasons for the delay, including that he could neither draft, nor research, his petition on his own. Accordingly, and in light of the extraordinary circumstances he faced, the Court cannot conclude Richardson failed to use reasonable diligence prior to the filing of his state post-conviction petition.[10]

***Efforts after the denial of the post-conviction petition PLA.*** Respondent argues that Richardson also was not diligent in pursuing relief after his post-conviction PLA was denied, noting that Richardson still had 197 days to file a timely petition at that point, and arguing that he was capable of, but chose not to, file the petition on his own. In support, Respondent raises the same points offered to dispute Richardson's mental limitation as an extraordinary circumstance.[11] R. 50 at 13-16.

---

[10] Moreover, and as Richardson points out, beginning when the Illinois appellate court affirmed his conviction in 2010 through and including the date on which the Illinois Supreme Court denied his post-conviction PLA in 2015, Richardson filed a petition for rehearing in the Illinois appellate court and a petition for leave to appeal in the Illinois Supreme Court, found an inmate to help draft and file his pro se state post-conviction petition, appealed the dismissal of that petition, and sought leave to appeal to the Illinois Supreme Court.

[11] Namely, that Richardson's reading skills had improved to a fifth-grade level by 2011, that a cellmate had helped him learn to write and that he in fact wrote letters to family members and Exoneration Project lawyers, and that all he had to do to

The Court has already analyzed and rejected these arguments and declines to do so again here.

But Respondent argues that Richardson was not reasonably diligent even assuming he did require help to file his petition because he did not seek assistance from more people. In so arguing, Respondent asks the Court to reject as unfounded and unreasonable Richardson's assertions that he feared harassment by other inmates if they learned the nature of his crime, or, in the case of the members of his former gang, the fact of his confession. R. 50 at 14. Respondent points to the deposition testimony of Kenneth Key, an inmate and so-called "prison litigator" who assisted other inmates with legal issues, and who testified that he and other prison litigators would help any inmate, regardless of his crime. *Id.* at 15 (citing R. 46, Ex. P at 26). But Key was housed in a different living unit, and Respondent offers no evidence of any other prison litigator in Richardson's unit who would have helped.[12]

Further, there can be no reasonable dispute that inmates convicted of violent crimes against children are frequently targets of violence. Respondent nevertheless asks the Court to ignore the statement in Richardson's mental health records that he was raped at Cook County Jail because of his crime, *id.* at 14 (citing R. 46, Ex. D at 4), calling it "double hearsay," and questioning its veracity because Richardson did

_____

prepare his petition was copy the arguments from his state court pleadings or attach sections of those pleadings to the Court's form habeas petition. R. 50 at 13-14.

[12] Moreover, even if Key had been housed at the F House, he could not provide the type of assistance Richardson needed. *See* R. 45, Ex. P at 20 ("[A] lot of guys are not drafting petitions for guys because of the shakedowns and them having possession of guy's legal work on them. . . . Me physically writing out his petition in my handwriting, that won't happen.").

not raise the attack in his declarations or deposition. R. 50 at 15. Richardson correctly points out that his statements as recorded in mental health records by Respondent's physicians fall within the hearsay exception for statements made for medical diagnosis or treatment. *See* Fed. R. Evid. 803(4) (exception for rule against hearsay for statements made for medical diagnosis or treatment, including statements describing general cause of medical history). And Respondent stipulated that the medical records themselves fall within the business records exception. R. 58, Ex. U. But the Court finds Richardson's fear of reprisal reasonable even without evidence of a previous attack.

Further, Respondent does not meaningfully dispute Richardson's claim that there is a large Gangster Disciple presence at Stateville. Nor could he. *See* R. 58, Ex. E (July 2017 Department of Justice article explaining that the Gangster Disciples originated in Chicago where they recruited "heavily," including "within Illinois jails and prisons"). And even if the Court were to conclude that Richardson's fear of gang reprisal was objectively unreasonable, the Court cannot wholly discount such fears, particularly considering Richardson's mental limitations. *See Mayberry*, 904 F.3d at 530 (a petitioner's "diligence must be evaluated in light of . . . his mental limitations").

Respondent next argues that even if Richardson's fears were legitimate, they do not explain why Richardson failed to ask prison litigators for help determining the filing deadline or the general habeas requirements, or his failure to seek assistance from state post-conviction counsel or family and friends. R. 50 at 15. But Respondent misrepresents the record. Richardson testified to having contacted both his direct

appeal public defender and his state post-conviction public defender, both of whom told him they were unable to help. *See* R. 45, Ex. N at 82, 85. And Richardson also sought help from his family, both to find a lawyer, and for money to pay inmates for help drafting his petition. *Id.* at 88-89. Respondent's argument regarding Richardson's alleged failure to seek help from prison litigators to ascertain the filing deadline or the general habeas requirements also fails; as noted, Key was housed in a different living unit, and Respondent has put forth no evidence of any other prison litigator who could have helped. And Richardson sought help from other prison litigators in any event, including Con and Shotgun. Nor would mere knowledge of the general habeas requirements or a better understanding of the filing deadline have resolved all of Richardson's barriers to filing; as discussed, even with that information, he still was unable to personally prepare and file his petition.

Respondent next contends that Richardson failed to follow prison grievance procedures by giving his grievances regarding lack of library access and assistance to another inmate, instead of directly to his counselor. R. 50 at 15. But Stateville policy specifically allowed inmates to pass grievances through others. *See* R. 50, Ex. 2 and R. 45, Ex. U at 6 (providing that grievances could be sent through the institutional mail). And Richardson's method was certainly more efficient than waiting weeks for a counselor to stop by so he could hand-deliver his grievance, and was typical in any event. *See* R. 45, Ex. P at 58 (counselors made rounds once every month or month-and-a-half); *see also* R. 45, Ex. A ¶ 26 ("Sometimes inmates hand their grievances directly to the unit counselor, but . . . [t]he more typical process is to give the grievance

form to the unit law clerk, who then gives it to the counselor."). Nor will the Court fault Richardson, as urged to by Respondent, for filing his grievances after the statute of limitations had run; efforts outside of the limitations period remain meaningful to the Court's analysis. R. 50 at 15.

Finally, Respondent disputes Richardson's claim that he was unable to pay inmates for assistance with his petition. Respondent correctly notes that Stateville trust fund records reflect $1000 in deposits from family and friends to Richardson's account in 2015, and an additional $150 pay for his work at the prison. Richardson's account also had a $260.48 balance in March 2015, when he claims to have been discussing his case with prison inmates. R. 50 at 15-16 (citing R. 45, Ex. A ¶ 14 and R. 50, Ex. 4 at 5 (reflecting a $260.48 balance on March 2, 2015)). But the Court will not fault Richardson for failing to begin work on his federal petition while his state post-conviction petition was still pending in March 2015. And the records make clear that Richardson generally did not have the funds requested of him after his post-conviction PLA was denied, and certainly did not have them when demanded.[13] *See* R. 50, Ex. 4 at 6 (reflecting an average balance of $31.76 from October 2015 to July 2016, and a balance of between $0.15 to $14.90 when Richardson asked for Con's help in October 2015, $0.18 to $14.55 when he asked for Fonz and Q's help in November

---

[13] Respondent also takes issue with the fact that Richardson averred in his first declaration that he paid Scrappy $100 to draft his petition, but then in his second indicated that he had "paid" him with homemade wine. R. 50 at 16 (citing R. 45, Ex. A ¶ 17 and R. 45, Ex. O ¶ 21). The Court assumes that these somewhat inconsistent representations were made erroneously due to miscommunication between Richardson and his counsel, and without the intent to deceive the Court.

2015, and $1.83 and $49.41 between April and July 2016 when Scrappy was working on his petition).

In sum, Respondent's contention that Richardson made "only anemic efforts to prepare his habeas petition" does not reflect the facts in the record, particularly given Richardson's mental limitations and the other circumstances outlined above. *See Mayberry*, 904 F.3d at 530 ("the question of [petitioner's] diligence must be evaluated in light of the broader picture of his mental limitations"). To hold otherwise would require "maximum feasible diligence," a standard that is not required. *Holland*, 560 U.S. at 653. Accordingly, the Court applies equitable tolling, rendering Richardson's petition timely.

## II.    Merits

### A.    Standard

"Federal habeas relief from a state-court criminal judgment is not easy to come by." *Thompkins v. Pfister*, 698 F.3d 976, 983 (7th Cir. 2012). When a state court has adjudicated a federal claim on the merits, a federal habeas court may not grant relief unless the state court's decision "was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States," or was based on "an unreasonable determination of the facts in light of the evidence presented in the State court proceeding." 28 U.S.C. § 2254(d). To prevail under this standard, the "prisoner must show that the state court's ruling on the claim being presented in federal court was so lacking in justification that there was an error well understood and comprehended in existing law beyond any

possibility for fairminded disagreement." *Ward v. Neal*, 835 F.3d 698, 703 (7th Cir. 2016). However, "[e]ven in the context of federal habeas, deference does not imply abandonment or abdication of judicial review. Deference does not by definition preclude relief." *A.M. v. Butler*, 360 F.3d 787, 801 (7th Cir. 2004) (citing *Miller-El v. Cockrell*, 537 U.S. 322, 340 (2003)).

### B.      Ineffective Assistance of Counsel

Richardson argues that his trial counsel was ineffective for failing to provide evidence of his mental deficiency to support his pre-trial motion to suppress his confessions, and at trial in support of his lack of intent defense, and that the Illinois Appellate Court unreasonably found that he did not receive ineffective assistance of counsel. R. 24 at 19-29; R. 29 at 10-21. Respondent argues that Richardson procedurally defaulted his ineffective assistance claim because it was not presented to the Illinois Supreme Court, and that the Illinois Appellate Court reasonably applied Supreme Court precedent to reject his claim in any event. R. 26 at 15-21. The Court will first address the procedural default argument, and then discuss the merits.

***Richardson's claim was not procedurally defaulted.*** In contending that Richardson defaulted on his ineffective assistance claim, Respondent argues that Richardson failed to raise the claim in "one complete round" of the state appellate review process. R. 26 at 15. Specifically, Respondent contends that the claim was not presented to the Illinois Supreme Court on direct appeal, and that on remand, the Illinois Appellate Court declined to address its merits. *Id.* Respondent argues that Richardson's subsequent post-conviction PLA concerned an argument that

Richardson's trial counsel was deficient for failing to have petitioner evaluated for his ability to understand *Miranda* warnings, and that this differs from Richardson's habeas claim contesting counsel's failure to present evidence of his mental incapacity. *Id.* at 16.

While a federal district court may not grant a writ of habeas corpus unless the petitioner exhausted his state court remedies, a habeas claim is properly exhausted and not procedurally defaulted if its "operative facts" and "controlling legal principles" were before the state courts. *Chambers v. McCaughtry*, 264 F.3d 732, 737-738 (7th Cir. 2001). This ensures that the state court has "a meaningful opportunity to pass upon the substance of the claim[]." *Id.* at 317 (citing *Rodriguez v. Scillia*, 193 F.3d 913, 916 (7th Cir. 1998)). A petitioner may even "reformulate his claims as long as the substance of the argument remains the same." *Chambers*, 264 F.3d at 738 (citing *Verdin v. O'Leary*, 972 F.2d 1467, 1474 (7th Cir. 1992)). "[M]ere variations in the same claim rather than a different legal theory will not preclude exhaustion." *Id.* (citing *Wilks v. Israel*, 627 F.2d 32, 38 (7th Cir. 1980) (internal citations omitted)). Yet, the "leeway afforded to habeas petitioners in 'reformulating' due process arguments is much more limited than in other constitutional contexts." *Id.* (citing *Kurzawa v. Jordan*, 146 F.3d 435, 443 (7th Cir. 1998)). "Mere similarity of claims is not enough." *Id.*

Here, the claims before the state courts were "variations in the same claim" arising out of the same "operative facts": that Richardson's trial counsel failed to procure and present evidence of Richardson's mental deficiencies at the suppression

hearing. *Chambers*, 264 F.3d at 737-738. Richardson's post-conviction PLA referenced his counsel's failure to present evidence of his mental deficiencies several times. By way of example, Richardson's PLA noted his post-conviction petition argument "that counsel was ineffective for failing to present evidence that he was unable to knowingly and intelligently waive his *Miranda* rights." Then, quoting from the same post-conviction petition: "Trial counsel's failure to marshal evidence on Petitioner's diminished capacity at the motion to suppress, and her failure to argue such evidence coupled with petitioner's youth weighed in favor of suppression, was objectively unreasonable." Richardson also stated in the PLA that he "argued that defense counsel should have discovered evidence of defendant's mental retardation before sentencing and used it at the motion to suppress." Ex. X at 15. Accordingly, the issue regarding trial counsel's failure to put forth evidence of Richardson's mental incapacity was plainly before the state courts.[14]

Nor does the distinction Respondent attempts to draw between Richardson's counsel's failure to *procure* evidence of his limited mental capacity and her failure to *present* that evidence make a difference. *See U.S. ex rel. Boyce v. Dobucki*, 993 F. Supp. 652, 656 (N.D. Ill. 1998) (failure to investigate and present witness is "one issue," and constituted a single claim in post-conviction petition). Given the PLA's references to Richardson's counsel's failure to "present," "argue," or "use" evidence of

---

[14] Richardson's mental deficiencies were also before the Illinois Supreme Court on direct appeal; in reversing and remanding the case to the appellate court on Richardson's involuntary confession claim, the Illinois Supreme Court considered the fact that Richardson's trial counsel presented no evidence or argument of any mental incapacity at the hearing on his motion to suppress his confession.

Richardson's limited mental capacity, the Court finds the Illinois Supreme Court had the opportunity to pass on the substance of the claim and was fairly alerted to the federal right in question. Accordingly, Richardson's ineffective assistance claim was not procedurally defaulted and the Court will review its merits.

***The state court unreasonably applied Supreme Court precedent.***

Respondent argues that Richardson's habeas petition should be denied even if the Court concludes it was not procedurally defaulted, because the Illinois Appellate Court reasonably applied Supreme Court precedent to conclude that Richardson's counsel was not ineffective. On habeas review, a petitioner claiming ineffective assistance must show that the state court unreasonably applied the standard for ineffective assistance set forth by the Supreme Court in *Strickland v. Washington*, 466 U.S. 668 (1984). The *Strickland* standard asks (1) whether counsel provided representation that "fell below an objective standard of reasonableness" (the performance prong), and (2) whether "there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different" (the prejudice prong). *Id.* at 688, 694; *see also Brady v. Pfister*, 711 F.3d 818, 823 (7th Cir. 2013). On habeas review, then, "the question is not whether counsel's actions were reasonable," but "whether there is any reasonable argument that counsel satisfied *Strickland's* deferential standard." *Harrington v. Richter*, 562 U.S. 86, 105 (2011). The *Strickland* analysis begins with "a strong presumption that counsel's conduct falls within the wide range of reasonable professional assistance." *Strickland*, 466 U.S. at 689. Because the *Strickland*

standard is "highly deferential" to a lawyer's strategic choices and the review of state court judgments under § 2254(d) is "likewise highly deferential," the Court's review is "doubly deferential." *Hinesley v. Knight*, 837 F.3d 721, 732 (7th Cir. 2016). In evaluating counsel's representation, the federal habeas court examines not only the lawyer's claimed error "of omission or commission," but also evaluates the "entire course of the defense." *Williams v. Lemmon*, 557 F.3d 534, 538 (7th Cir. 2009); *see also Harrington*, 562 U.S. at 111 ("[I]t is difficult to establish ineffective assistance when counsel's overall performance indicates active and capable advocacy."). Indeed, under *Strickland*, a federal habeas court must "assess counsel's work as a whole, and it is the overall deficient performance, rather than a specific failing, that constitutes the ground for relief." *Pole v. Randolph*, 570 F.3d 922, 934 (7th Cir. 2009) (internal quotation marks omitted).

Richardson claims that his trial counsel failed to offer evidence regarding his mental capacity and unstable upbringing to support Richardson's motion to suppress his confessions. R. 24 at 20-29. His claim is supported by the evidence presented at the suppression hearing because there was no such evidence. While Richardson's trial counsel requested several continuances to obtain evidence of Richardson's limited mental ability, she never presented any. Even if counsel was unable to obtain an evaluation or an expert witness in time for the suppression hearing despite reasonable efforts, counsel still could have questioned Richardson, his mother, or another witness regarding Richardson's mental capacity and upbringing. But she did not. The Supreme Court has found similar failures to uncover or present evidence of

a defendant's mental impairment supportive of an ineffective assistance claim. *See Porter v. Mc Collum*, 558 U.S. 30, 41 (2009) (failure to present evidence of "brain abnormality, difficulty reading and writing, and limited schooling" supported ineffective assistance claim); *Wiggins v. Smith*, 539 U.S. 510, 534-535 (2003) (failure to discover and present evidence of, among other things, petitioner's diminished mental capacities, supported claim of counsel's inadequate performance).

Furthermore, the Illinois Appellate Court and the Illinois Supreme Court emphasized this lack of evidence. The Illinois Supreme Court noted that "at the suppression hearing, defendant presented no evidence or argument of any mental deficiency that would render his inculpatory statement involuntary, and the circuit court made no findings relating thereto," and concluded that "[t]he issue of defendant's mental capacity was not raised until sentencing." *Richardson II*, 917 N.E.2d at 519.

On direct appeal, the Illinois Appellate Court found that "defense counsel offered no evidence to support the claim that defendant was unable to waive his Miranda rights," and added "[t]here is not a scintilla of evidence to support a finding that defendant acted recklessly rather than knowingly and intentionally." *Richardson III*, 929 N.E.2d at 47-48. While on direct appeal the appellate court was unwilling to speculate as to evidence not in the record in determining the merits of Richardson's ineffective assistance of counsel claim, it informed Richardson that his claim would be better raised in a post-conviction petition, where such evidence would be critical. *Richardson III*, 929 N.E.2d at 47.

But on appeal of the dismissal of his post-conviction petition, the appellate court determined both: (1) that counsel must have had Richardson evaluated but did not submit the evidence because it was not helpful to Richardson's motion to suppress; and (2) that Richardson was not prejudiced by this failure in any event. The Court is not willing to make the same assumption on the first point, especially considering that Richardson was evaluated and found to have an IQ of 61 prior to sentencing. As noted, this falls within the Extremely Low range of intellectual functioning and ranks Richardson behind 99.5% of his same aged peers.[15]

Nor can the Court agree with the appellate court's determination that Richardson was not prejudiced by counsel's failures. In assessing prejudice, *Strickland* "asks whether it is 'reasonably likely' the result [of the trial] would have been different." *Harrington*, 562 U.S. at 111 (quoting *Strickland*, 466 U.S. at 696). To make this showing, a petitioner must show that "[t]he likelihood of a different result must be substantial, not just conceivable." *Id.* at 112. Richardson may well satisfy this standard. Richardson's mental capacity and unstable upbringing are important factors that should have been considered in determining whether his confessions were voluntary, and the judge at the motion to suppress hearing did not have the opportunity to weigh these factors coupled with the police employee attack on Richardson in determining the voluntariness of his confessions. As discussed further below, the court thus did not have the opportunity to review "the totality of all the

---

[15] Nor would it be reasonable to suggest that Richardson would have performed better on the evaluation at the time of trial, given that these results came after receiving four years of special education while incarcerated.

surrounding circumstances—both the characteristics of the accused and the details of the interrogation." *Schneckloth v. Bustamonte*, 412 U.S. 218, 226 (1973). Richardson's confessions were nonetheless admitted, and his videotaped confession was presented to the jury.

Admitting Richardson's confessions was not harmless. Without the videotaped confession, Richardson may not have felt compelled to testify. Furthermore, the only eye-witness presented at trial by the State was Franklin, a ten-year-old boy who testified that Richardson was not trying to hurt Diamond. Franklin's testimony is inconsistent with the contention that Richardson was guilty of first-degree murder. Respondent argues that even without the videotaped confession there was substantial evidence of Richardson's guilt, pointing to the pathologist report and the reporting officer's testimony. However, Richardson does not contest the fact that his actions caused the death of his daughter. Indeed, his *entire defense* at trial was his lack of intent. Even with the videotaped confession, the jury wanted to consider a lesser offense. And the trial court seemed inclined to give the instruction, but decided it could not, reasoning, "if there were any—and I will emphasize any—credible evidence to support a reckless act I would have given the involuntary instruction." *Richardson V*, 30 N.E.3d at 347 (Pucinski, J., dissenting) (quoting trial court).

Finally, an analysis of Richardson's trial counsel's overall representation reveals that counsel not only failed to present evidence of Richardson's mental capacity and unstable upbringing at the suppression hearing, but also failed to do so at other critical points in the proceedings. Specifically, counsel failed to provide this

evidence at trial and in the request for an involuntary manslaughter instruction. Richardson's mental capacity and unstable upbringing would have supported Richardson's lack of intent defense. *Compare* Illinois Pattern Jury Instruction 7.01 ("A person commits the offense of first degree murder when he kills an individual if, in performing the acts which cause the death, [1] he intends to kill or do great bodily harm to that individual; [2] he knows that such acts will cause death to that individual; or [3] he knows that such acts create a strong probability of death or great bodily harm to that individual) *with* Illinois Pattern Jury Instruction 7.07 ("A person commits the offense of involuntary manslaughter when he unintentionally causes the death of the an individual [without lawful justification] by acts which are performed recklessly and are likely to cause death or great bodily harm to another.") Thus, neither is the Court able to excuse this failure as a strategic move for trial. There simply is no conceivable strategy that would justify this significant oversight.

It is thus "substantial, not just conceivable" that the jury could have found that Richardson lacked the necessary intent for first-degree murder had either or both his confessions been suppressed or other evidence of his mental incapacity and unstable upbringing been presented at trial. *Harrington*, 562 U.S. at 112. Thus, the state appellate court's rejection of Richardson's ineffective assistance of trial counsel claim was an unreasonable application of *Strickland*, under which there can be no reasonable argument that Richardson's counsel's failure to present this evidence passes muster.

But all of this analysis may yet be for nothing. In a footnoted, alternative argument responding to Richardson's merits brief, Respondent asked for an evidentiary hearing on the issue of Richardson's trial court counsel's performance, and in particular regarding her strategy for failing to introduce any evidence of Richardson's mental impairment. R. 26 at 19, n.4. While arguments addressed in undeveloped footnote form generally are waived, the Court allowed briefing on the need for an evidentiary hearing on this limited point given its potential impact on the resolution of the case. *Harmon v. Gordon*, 712 F.3d 1044, 1053 (7th Cir. 2013) ("We have often said that a party can waive an argument by presenting it only in an undeveloped footnote."). The issue is now fully briefed. Richardson argues that there is no dispute that Richardson suffers from mental limitations and that it would be unfair to further delay the proceedings for additional confirmation of that fact. R. 47. But Respondent counters in compelling fashion that what is relevant to Richardson's ineffective assistance claim is what Richardson's trial counsel knew at the time of the suppression hearing; that is, what the psychological evaluation revealed, and why his trial counsel did not present that evaluation—facts yet to be discovered by either party, but a point on which Richardson bears the burden of proof. R. 43; R. 52. Accordingly, the Court will permit limited discovery and an evidentiary hearing on this point.

### C.     Involuntary Confession

Richardson also argues that the Illinois Supreme Court unreasonably applied clearly established federal law to find that his confessions were voluntary. R. 24 at

12-19; R. 29 at 2-10. In response, Respondent argues that Richardson's confessions were made without police coercion and thus were not involuntary, pointing in particular to the Illinois Supreme Court's finding that the injuries he suffered following arrest were "unrelated" to his confession, and also calling out the court's identification and application of the controlling totality-of-the-circumstances test and the other "overwhelming" evidence of Richardson's guilt, and arguing any error in admitting Richardson's confessions was harmless. R. 26 at 10-15.

Involuntary confessions are prohibited as evidence in a criminal prosecution by the Due Process Clause of the Fourteenth Amendment. *Dassey v. Dittmann*, 877 F.3d 297, 303 (7th Cir. 2017) (citing *Miller v. Fenton*, 474 U.S. 104, 109 (1985)). A confession is considered voluntary "if, in the totality of circumstances, it is the product of a rational intellect and free will and not the result of physical abuse, psychological intimidation, or deceptive interrogation tactics that have overcome the defendant's free will." *Carrion v. Butler*, 835 F.3d 764, 775 (7th Cir. 2016) (quoting *United States v. Gillaum*, 372 F.3d 848, 856 (7th Cir. 2004) (internal quotation marks omitted)). In determining whether a confession is voluntary, a court reviews "both the characteristics of the accused and the details of the interrogation." *Schneckloth*, 412 U.S. at 226. Special factors considered by the courts for juvenile defendants "[include the] evaluation of the juvenile's age, experience, education, background, and intelligence, and into whether he has the capacity to understand the warnings given him, the nature of his Fifth Amendment rights, and the consequences of waiving those rights." *Fare v. Michael C.*, 442 U.S. 707, 725 (1979). Thus, determining

whether a confession is voluntary requires a court's careful consideration of all the circumstances of the interrogation. *Mincey v. Arizona*, 437 U.S. 385, 401 (1978).

The Court concludes that while the Illinois Supreme Court reasonably applied United States Supreme Court precedent to find that Richardson's confessions were voluntary, due to the potential ineffective assistance of Richardson's counsel outlined above, the court did not have the opportunity to weigh Richardson's mental capacity and unstable upbringing with the other factors tending to show otherwise. As noted, the Illinois Supreme Court found that, "at the suppression hearing, defendant presented *no evidence or argument* of any mental deficiency that would render his inculpatory statement involuntary, and the circuit court made no findings relating thereto." *Richardson II*, 917 N.E.2d at 519 (emphasis added). As noted, at the time of his confessions, Richardson was illiterate, and it is reasonable to assume he had an IQ in the 0.5th percentile, if not lower, given the four years of special education he received while incarcerated prior to his testing. A defendant's low intelligence is an important factor when determining whether a confession was voluntary. *See United States v. Hull*, 441 F.2d 308, 312 (7th Cir. 1971) (confession involuntary in part because petitioner was "mentally and emotionally handicapped"); *Davis v. North Carolina*, 384 U.S. 737, 742 (1966) (confession involuntary where defendant had a "third or fourth grade education").

Other factors also weigh in favor of deeming Richardson's confessions involuntary. First, Richardson was physically attacked by a police employee prior to his confessions at the same facility where he was interrogated, leaving him with a

visible black-eye and swollen face. Physical attacks are another important factor in considering whether a confession is voluntary. *See Sims v. Georgia*, 389 U.S. 404, 406-07 (1967) (per curiam) (finding signed confession before a sheriff involuntary where the illiterate defendant with limited mental capacity claimed he was physically attacked by the medical examiner, and the fact that defendant was advised "of his right not to speak [was] of little significance"); *Holland v. McGinnis*, 963 F.2d 1044, 1050 (7th Cir. 1992) ("It is axiomatic that a confession extracted with violence or the threat of violence is involuntary" (citing *Miller v. Fenton*, 474 U.S. 104, 109-110 (1985))). Richardson's injuries also were not examined or treated at any time prior to his confessions. In fact, internal affairs staff, assigned to investigate the attack, were not even permitted to speak to Richardson until after his interrogation concluded. While Respondent attempts to separate the attack from Richardson's confessions, the time between the two was brief—approximately three hours. And it would be reasonable for Richardson to fear another confrontation with his attacker, given that the attack on him occurred in the same building as his interrogations. It is thus more than reasonable that Richardson would be unable to "separate the fear associated with being punched by police personnel from any subsequent interactions with police officers or detectives involved in this case." *See Richardson I*, 875 N.E.2d at 1208.

Second, at the time of his confessions, Richardson was only sixteen years old. A defendant's youth is yet another factor weighed heavily by the courts. *See Reck v. Pate*, 367 U.S. 433, 441 (1961) (nineteen-year-old's confession involuntary due in part to age and "subnormal intelligence"); *Gallegos v. Colorado*, 370 U.S. 49, 53-54 (1962)

(fourteen-year-old's confession involuntary due in part to age); *Gilbert v. Merchant,* 488 F.3d 780, 791 (7th Cir. 2007) (confessions by juveniles "must be evaluated with 'special care'" (quoting *Haley v. Ohio,* 332 U.S. 596, 599 (1948)).

Courts must also consider the "length of time that the juvenile was questioned by the authorities and the absence or presence of a parent or other friendly adult." *Gilbert,* 488 F.3d at 791. Respondent argues that Richardson's mother and Investigator Nolan represented Richardson's interests during the interrogations. However, Investigator Nolan did not act to protect Richardson's rights during the investigation—which spanned thirteen hours through the night, and included three separate interrogations with little opportunity for sleep. His role was simply to investigate. In fact, Investigator Nolan questioned Richardson himself during the interrogations. Even if Investigator Nolan had merely observed rather than participated in the interrogation, he still would not represent the "friendly adult presence" the totality of the circumstances test contemplates. *See Hardaway v. Young*, 302 F.3d 757, 765 (7th Cir. 2002) ("[A] state-provided youth officer who functions as nothing more than an observer will not be considered a friendly adult presence for purposes of the totality of the circumstances test.").

Neither could Richardson's mother be considered a "friendly adult" for these purposes. As both the mother of the defendant and the grandmother of the victim, she surely was conflicted. Her history of alcohol and drug abuse and physical abuse toward Richardson likewise call into doubt her support. Furthermore, her testimony at trial was that she felt afraid during the interrogations and believed she was treated

poorly by detectives. Accordingly, it would be unreasonable to expect her to look after Richardson's interests. *See Richardson V*, 30 N.E.3d at 363-364 (Pucinski, J., dissenting) (noting Richardson's mother was a crack cocaine addict and alcoholic who "pushed [Richardson] out to live with her boyfriend's sister to babysit that woman's three children," and that "[m]aybe he was better off" there since his mother "beat him regularly").

Nevertheless, Respondent contends that the Seventh Circuit's *en banc* decision in *Dassey v. Dittman*, 877 F.3d 297 (7th Cir. 2017) precludes relief. Specifically, Respondent argues that the Illinois Supreme Court's assessment of Richardson's confession was not unreasonable because, as in *Dassey*, the factors pointed "in both directions," with youth and an injury while in custody on Richardson's side, and Richardson's statements that his confession was unrelated to his injury, the presence of his mother and a youth officer, the lack of coercive questioning, and the truthful nature of his confession on the other. R. 43 at 2-3. Respondent further contends that the Illinois Supreme Court did enough by simply acknowledging that Richardson's age was a factor requiring the "greatest care," and that Richardson can identify no United States Supreme Court case that "mandates" relief. *Id.* at 3. But the Court agrees with Richardson that *Dassey* did not establish new law and is distinguishable, including because his case involves police violence as in *Sims*, and because Richardson's intellectual disabilities were more extreme than the petitioner in *Dassey*. *Cf. Dassey*, 877 F.3d at 303, 313 (distinguishing the case from those involving physical coercion because Dassey "was not subject to physical coercion or any sort of

threats at all," noting that "prohibitions on physical coercion are absolute," and that the petitioner's IQ was between 74 and 81); *see also Sims*, 389 U.S. at 407 ("It needs no extended citation of cases to show that a confession produced by violence or threats of violence is involuntary and cannot constitutionally be used against the person giving it."). *Dassey* does not doom Richardson's involuntary confession claim.

*     *     *     *     *

If trial counsel is found to have been ineffective following the additional discovery and evidentiary hearing ordered *infra*, the impact cannot be overstated. As a direct result, the Illinois Supreme Court did not have the opportunity to consider Richardson's mental capacity, Richardson's mother's alcohol and drug addiction, or Richardson's otherwise unstable upbringing—factors courts find critical in determining whether a juvenile's confession was voluntary. It is highly probable that the court would have suppressed Richardson's confessions had it viewed these factors alongside the physical attack at the police station, Richardson's youth, the lengthy investigation with little opportunity for sleep, and the lack of a "friendly adult" at his interrogations. Lacking such evidence, the court also lacked the opportunity to review the true "totality of all the surrounding circumstances." *Schneckloth*, 412 U.S. at 226. Although reasonable on what was then before the court, the court's review was thus incomplete, and Richardson's confessions were involuntary under clearly established law. As discussed, the admission of the confessions was not harmless. Without the confessions, Richardson may not have felt compelled to testify at trial. Without his testimony, the only eyewitness was Franklin, whose testimony directly contradicted

any argument that Richardson intended to commit murder that February 2001 day. With just Franklin's testimony and the pathologist's report, it is reasonably likely that the jury would not have found sufficient evidence of intent to convict Richardson of first-degree murder. Accordingly, the final determination on Richardson's involuntary confession claim awaits the discovery and evidentiary hearing ordered above.

## Conclusion

For the foregoing reasons, the Court grants Richardson's motion to equitably toll the time for filing his habeas petition, R. 45, but withholds judgment on the merits of Richardson's petition, R. 24, pending the limited additional discovery and subsequent evidentiary hearing described above.

ENTERED:

_____
Honorable Thomas M. Durkin
United States District Judge

Dated: August 6, 2019