## UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF ILLINOIS
## EASTERN DIVISION

| | | |
|---|---|---|
| ANDRE RICHARDSON, | ) | |
| | ) | |
| Petitioner, | ) | |
| | ) | No. 16 C 7422 |
| v. | ) | |
| | ) | Judge Thomas M. Durkin |
| JEFF DENNISON, | ) | |
| | ) | |
| Respondent. | ) | |

### MEMORANDUM OPINION AND ORDER

Andre Richardson filed a petition for writ of habeas corpus pursuant to 28 U.S.C. § 2254 challenging his first-degree murder conviction in the death of his infant daughter. Respondent Warden Jeff Dennison now moves for summary judgment following Court-ordered discovery. R. 94. For the following reasons, Respondent's motion is granted, and Richardson's petition is denied.

## Background

### I.     Underlying Facts

The Court assumes familiarity with the underlying facts, which are set forth in summary form here, and in more detail in the Court's August 6, 2019 memorandum opinion and order, R. 61 ("Equitable Tolling Order").

On February 9, 2001, then-sixteen-year-old Richardson was investigated and arrested in connection with the death of his eleven-month-old daughter, Diamond. Richardson does not dispute that his actions resulted in his daughter's death, but

argues that he did not act with the intent necessary for a first-degree murder conviction because he is mentally challenged.

The medical examiner who performed the autopsy determined that Diamond died from injuries she sustained due to an assault, counting 61 injuries in total. Richardson was arrested for child abuse and taken to the Second District police station the afternoon of Diamond's death, where he was subsequently attacked by a police employee, causing a black eye and swollen face. Richardson told the youth investigator assigned to investigate Diamond's case and detectives that he had been struck by lockup personnel. The police department's Office of Professional Standards opened an investigation into the attack. It is unclear how that investigation was resolved.

Richardson was later interrogated three times in a thirteen-hour period that began the evening of his arrest and continued into the following morning. The first interrogation took place around 9:00 p.m. in a small, windowless room and lasted approximately 45 minutes. The youth investigator asked Richardson questions along with the detectives, and Richardson's mother was also present. Richardson made an inculpatory statement, the details of which are not reflected in the record. Shortly thereafter, the detectives summoned Assistant State's Attorney John Heil.

ASA Heil began interrogating Richardson in the same small room around 12:30 a.m. in the presence of Richardson's mother, the youth investigator and a detective. ASA Heil advised Richardson of his *Miranda* rights and informed him that Diamond had died. Richardson had been in custody for nine hours at this point, and had not

slept or received medical attention for his injuries. He was not aware that he would be charged with murder, and confessed a second time, describing his interactions with Diamond the day of her death. According to ASA Heil, Richardson explained that he had picked her up from her mother's house the night before to babysit her, and that she fell and hit her head. He said he gave her cereal the next morning and hit her several times when she dropped it on the floor, poked at her stomach afterward causing her to vomit, struck her for vomiting, and struck her numerous times with a plastic hanger and then with a belt when she continued to vomit. He explained that he then put her in the corner and hit her when she turned to look at him because he had told her not to, and told her to go stand against the wall. When she fell, he picked her up and shook her hard, causing her to hit her head on the windowsill and on the window casing. Richardson said he asked a neighbor to call the police when she became unresponsive.

Afterwards, the youth investigator and detective were excused from the room and ASA Heil had an unrecorded discussion with Richardson. According to ASA Heil, Richardson told him that the earlier physical attack at the police station did not influence his confession, and that he had been treated fine since. ASA Heil thereafter explained to Richardson his options for memorializing his statements, and Richardson chose to give a videotaped statement.

Richardson's final interrogation and videotaped statement began around 9:30 a.m. the same morning. Richardson had slept 2 to 3 hours before that. Richardson's mother, the youth investigator, one of the detectives, and ASA Heil were all present,

and Richardson was again advised of his *Miranda* rights. When asked if he knew what it meant to say that "anything you say can be used against you in a court of law," Richardson answered, "Whatever I say, I will tell and say it in court." In response, ASA Heil repeated "And some – it could be used against you in court? Do you understand that?" Richardson responded "yes," and Heil went on with the interrogation. Richardson confessed a third time on videotape.

## II.    State Court Conviction

Richardson's attorney moved to suppress Richardson's confession before trial, arguing among other things that Richardson's "physical, mental, educational and/or psychological state, capacity and condition" prevented him from fully understanding his *Miranda* rights. *People v. Richardson*, 917 N.E.2d 501, 505 (Ill. 2009) (*Richardson II*). His counsel requested several extensions to have Richardson's mental capacity evaluated and questioned his mother at the suppression hearing about the physical attack on Richardson and interrogations. But counsel did not question Richardson's mother about Richardson's mental limitations at the hearing or otherwise present evidence related to any mental deficits. The trial court thereafter denied Richardson's motion to suppress, concluding that his confessions were given "freely and voluntarily" because he was advised of and acknowledged understanding his *Miranda* rights, and did not request medical assistance or a lawyer.

As a result, the prosecution played Richardson's videotaped confession to the jury, in which he stated that he: struck Diamond on the hand; bit her on the shoulder and stomach; "karate chopped" her ribs; "whooped" her on the butt with a plastic

4

clothes hanger; hit her with a belt; smacked her in the face; and spanked her on her "pamper." Richardson also said that his statement had nothing to do with the attack on him; that he was treated fairly and allowed time alone with his mother; that he ate, slept, and had access to a restroom; and that no threats or promises were made to him or his mother in exchange for his statement. Richardson testified during the defense's case. In that testimony, he indicated that the videotaped statement was accurate, except that he did not hit Diamond with a belt.

Richardson's main defense at trial was that he lacked the intent or knowledge to commit first-degree murder. The court denied his attorney's request for a jury instruction on the lesser-included offense of involuntary manslaughter, concluding that there was no evidence of recklessness. During deliberations, the jury asked the court if it could convict Richardson of a lesser offense. But the court denied the request, and Richardson was found guilty of first-degree murder.

Richardson's Pre-Sentence Investigative Report ("PSIR") revealed that he suffered from lifelong learning disabilities, was illiterate when he confessed, and was raised without a father. The PSIR also described his mother's history of alcohol and drug addiction, and that she beat Richardson with various objects.

The court ordered an examination to determine whether Richardson was fit for sentencing.[1] As part of that evaluation, Richardson scored 61 on an IQ test, ranking him in the 0.5th percentile, and falling within the extremely low range of intellectual

---

[1] There is no record evidence that Richardson underwent an evaluation to determine whether he was competent to stand trial.

functioning. Richardson was classified as being in the "upper echelon of mild mental retardation." But the psychologist and court found him fit for sentencing, and he was sentenced to 40 years' imprisonment.

## III.    Direct Appeal

Richardson appealed, arguing among other things that (1) his confessions should have been suppressed, and (2) he received ineffective assistance of counsel. *People v. Richardson*, 875 N.E.2d 1202, 1204 (Ill App. Ct. 2007) (*Richardson I*). The appellate court held that Richardson's confessions were coerced and remanded the case for a new trial. *Id.* at 1208. The state appealed to the Illinois Supreme Court, which reversed in part, concluding that Richardson's post-arrest injuries had no effect on his confessions, which were voluntary under the totality of the circumstances. *Richardson II*, 917 N.E.2d at 520-21. The court remanded the remaining contentions because the appellate court did not consider them. *Id.*

On remand, the appellate court declined to address whether Richardson's counsel had been ineffective for failing to offer expert testimony concerning his mental impairment in support of his motion to suppress, reasoning that the claim was based on extra-record matters better evaluated on collateral review. *People v. Richardson*, 929 N.E.2d 44, 48 (Ill App. Ct. 2010) (*Richardson III*). The appellate court affirmed the trial court's decision on Richardson's other contentions, including that the evidence did not warrant an involuntary manslaughter instruction. *Id.* at 50. The Illinois Supreme Court denied Richardson's petition for leave to appeal ("PLA")

concerning the trial court's failure to give an involuntary manslaughter instruction. *People v. Richardson*, 938 N.E.2d 528 (Ill. 2010) (*Richardson IV*).

## IV. State Post-Conviction Proceedings

Richardson then filed a *pro se* petition for post-conviction relief in the Circuit Court of Cook County arguing that trial counsel was ineffective for failing to present evidence of his mental deficits at the hearing on his motion to suppress. His petition was summarily dismissed as frivolous and patently without merit.

Richardson was appointed an attorney to represent him in his appeal. But the appellate court affirmed, reasoning that "[g]iven defense counsel's repeated representations to the court that she needed additional time to have Richardson evaluated," it was "obvious that Richardson was, in fact, evaluated and the evaluator reached conclusions not helpful to Richardson's motion to suppress, thus readily explaining the lack of such evidence" at the hearing. *People v. Richardson*, 30 N.E.3d 336, 346 (Ill. App. Ct. 2015) (*Richardson V*). The court continued that Richardson's confessions would not have been suppressed even with evidence of his mental deficits, and that even if they were, there was no reasonable probability that the outcome of the trial would have been different. The court cited the "overwhelming" evidence against Richardson, including: (1) that Diamond was in good condition when she left in Richardson's care but unconscious and injured when the first officer arrived to the scene; (2) that Richardson told the responding officer that he had whipped Diamond; (3) ten-year-old James Franklin's testimony that he was present when Richardson spanked, punched, and shook his daughter; (4) Richardson's testimony that he had

repeatedly shook, bit, and hit Diamond; and (5) the medical examiner's testimony that Diamond sustained 61 different injuries, the location and types of which were consistent with both Franklin's and Richardson's testimony regarding how the injuries were inflicted. *Id.* at 343.

But a 36-page dissent by Justice Pucinski described the "disastrous ripple effect" that the lack of evidence of Richardson's mental impairments had on the trial, negatively impacting: the defense theory that Richardson lacked the requisite intent to murder; the motion for directed finding; the request for an involuntary manslaughter instruction; the motion for mistrial; and sentencing. *Id.* at 347-83 (Pucinski, J. dissent). Justice Pucinski also pointed out the unfairness of summarily dismissing a petition filed by a *pro se* petitioner of "limited education and limited intelligence." *Id.* at 354. The Illinois Supreme Court denied Richardson's PLA. *People v. Richardson*, 39 N.E.3d 1009 (Ill. 2015) (*Richardson VI*).

## V.    Federal Habeas Petition

Richardson thereafter filed a *pro se* petition for relief pursuant to the federal habeas statute, 28 U.S.C. § 2254. R. 1. This Court appointed counsel, through whom Richardson filed an amended petition asserting: (1) that his trial counsel provided ineffective assistance by failing to submit evidence of his mental deficiencies; and (2) that his confession was coerced and thus involuntary. R. 24. Respondent answered the petition, arguing that it was untimely and that the claims raised were procedurally defaulted and meritless. R. 26.

## A. Equitable tolling

Amid briefing the merits of Richardson's petition, and in response to Respondent's argument that his petition was untimely, Richardson filed a motion for equitable tolling. R. 46. After briefing, the Court granted Richardson's motion, concluding that extraordinary circumstances—including his mental limitations— prevented him from timely filing his petition, and that he had nevertheless pursued his rights diligently. *See* Equitable Tolling Order at 22-41. But the Court reserved ruling on the merits of Richardson's petition pending additional discovery and briefing on the issue of what "Richardson's trial counsel knew at the time of the suppression hearing; that is, what the psychological evaluation revealed, and why his trial counsel did not present that evaluation—facts yet to be discovered by either party, but a point on which Richardson bears the burden of proof." *Id.* at 51. The Court explained that the results would dictate the outcome of his petition.

## B. Additional facts relevant to summary judgment

The following facts are taken from the parties' statements of undisputed facts and responses thereto submitted pursuant to Local Rule 56.1 following the Court-ordered discovery.

Cynthia Brown was appointed Richardson's lead defense attorney in 2001 and was deposed after the Court issued the Equitable Tolling Order. Brown worked for the Cook County Public Defender's Office from 1985 until her retirement in 2014, representing hundreds of clients, including juveniles charged as adults and those with learning and mental disabilities. Brown was a member of the Murder Task

Force—an elite division of the Public Defender's Office focused on defending capital and non-capital murder cases—and had significant experience litigating suppression motions and working with expert witnesses.

Jacqueline Ross served as second chair on Richardson's case and was deposed as part of the discovery ordered in this case. Ross worked as a public defender for 20 years until she retired in 2008, and, like Brown, was a member of the Murder Task Force.

Brown learned that Richardson had learning and mental deficits early in her investigation of Richardson's case through Richardson's mother, who told her that Richardson was in special education classes, and through Richardson's teenage brother Troy Gaston, who told her about his perceptions of Richardson's mental disabilities and how they affected his day-to-day life. Gaston also told Brown that Richardson was frequently abused by his mother. In addition, Brown obtained and reviewed Richardson's records from Chicago Public Schools and law enforcement. School records from 1995 and 1998 indicated that Richardson had been placed in special education classes, was diagnosed as learning disabled, consistently tested in the bottom 5-10% of his peers on standardized testing, and read at a second-grade level as an eighth grader. Those records also reflected (among other things) that Richardson: lived in the projects with parents who were involved in drugs; slept on the floor because he did not have a bed; "need[ed] a role model or something positive in his life" and "counseling to help him with 'peer pressure and other family issues;'" had "borderline cognitive function" and "delayed" motor perception; and had a

physical altercation with a teacher and an unexplained charge of aggravated battery that was quickly dismissed.

Brown hired clinical psychologist Dr. Randi Zoot to evaluate Richardson in the summer of 2003 with an eye toward presenting evidence of his mental deficits. Brown asked Dr. Zoot to opine on whether Richardson: (1) had the ability to knowingly waive his *Miranda* rights; and (2) could claim that he lacked the requisite intent for first-degree murder. Brown discussed the facts of the case with Dr. Zoot and provided her with a transcript of Richardson's video-taped confession,[2] some of Richardson's school records, and other documents.

Dr. Zoot's billing records reflect that she reviewed Richardson's records and spent three-and-a-half hours interviewing him and administering in-person tests in July 2003. Before doing so, Dr. Zoot discussed with Richardson the importance of focusing and taking the interview seriously.

After the interview, Brown had at least two conversations with Dr. Zoot and made notes regarding the same. Brown's notes reflect that on August 8, Dr. Zoot described Richardson as "very limited," and indicated that his deficits could provide "some mitigation" of his culpability at trial. Brown's notes also reflect that Richardson scored a 51 on his IQ test. But Dr. Zoot stated that she could not get an "accurate read" of Richardson's deficits because he was malingering or exaggerating his disability, and she was not sure if Richardson was "even mildly mentally retarded."

---

[2] It is unclear whether Brown also provided Dr. Zoot with the video recording itself.

Ultimately, Dr. Zoot concluded that Richardson had "enough experience and enough intellectual ability to knowingly waive" his *Miranda* rights.

Brown spoke to Dr. Zoot again in January 2004 in part to explore whether Dr. Zoot might testify that Richardson's deficits prevented him from forming the necessary intent for first degree murder. Dr. Zoot reiterated that she could not get a completely accurate assessment of Richardson's intellectual level because of his malingering, but determined that: (1) he "was not so intellectually limited that he didn't know what he was doing;" and (2) his deficits did not prevent him from "know[ing] his acts created a strong probability of death or great bodily harm."

In the meantime, Brown had obtained multiple continuances from the trial court to give Dr. Zoot time to complete her evaluation and decide how to proceed. At some point, Brown also asked Dr. Zoot whether she would speak with Richardson again. But Dr. Zoot told Brown that additional interviews were unnecessary because her opinion that Richardson knowingly waived his *Miranda* rights was "very solid." Ultimately, Brown testified that she did not call Dr. Zoot at the suppression hearing or trial because of this conclusion and her conclusions that Richardson's deficits did not prevent him from forming the necessary intent for first-degree murder and that he was malingering.

Brown also testified that she had considered but decided against presenting a fact witness to speak to Richardson's deficits—including as reflected in his school records—because: (1) without an expert, she believed she would be unable to tie his deficits to the ultimate issues at trial; (2) putting on such evidence without an expert

would open the door to a damaging rebuttal, including the prosecution's own expert who she would expect to testify similarly to Dr. Zoot had opined; and (3) she planned to utilize other evidence to support her arguments—specifically, evidence that Richardson had been assaulted by police before confessing, and Richardson's videotaped confession and live testimony that he did not intend to kill Diamond.[3]

## Standard

Summary judgment is appropriate "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a); *see also Celotex Corp. v. Catrett*, 477 U.S. 317, 322-23 (1986). The Court considers the entire evidentiary record and must view all of the evidence and draw all reasonable inferences from that evidence in the light most favorable to the nonmovant. *Horton v. Pobjecky*, 883 F.3d 941, 948 (7th Cir. 2018). To defeat summary judgment, a nonmovant must produce more than a "mere scintilla of evidence" and come forward with "specific facts showing that there is a genuine issue for trial." *Johnson v. Advocate Health and Hosps. Corp.*, 892 F.3d 887, 894, 896 (7th Cir. 2018). Ultimately, summary judgment is warranted only if a reasonable jury could not return a verdict for the nonmovant. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986).

---

[3] Aside from his contention that trial counsel "should have introduced evidence of his mental incompetence at the suppression hearing and at trial," Richardson stipulates that he "does not allege deficiency in any other aspect of [trial counsel's] representation." R. 101, Ex. 6.

## Analysis

"Federal habeas relief from a state-court criminal judgment is not easy to come by." *Thompkins v. Pfister*, 698 F.3d 976, 983 (7th Cir. 2012). When a state court has adjudicated a federal claim on the merits, a federal habeas court may not grant relief unless the state court's decision "was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States," or was based on "an unreasonable determination of the facts in light of the evidence presented in the State court proceeding." 28 U.S.C. § 2254(d). To prevail under this standard, the "prisoner must show that the state court's ruling on the claim being presented in federal court was so lacking in justification that there was an error well understood and comprehended in existing law beyond any possibility for fairminded disagreement." *Ward v. Neal*, 835 F.3d 698, 703 (7th Cir. 2016). However, "[e]ven in the context of federal habeas, deference does not imply abandonment or abdication of judicial review. Deference does not by definition preclude relief." *A.M. v. Butler*, 360 F.3d 787, 801 (7th Cir. 2004) (citing *Miller-El v. Cockrell*, 537 U.S. 322, 340 (2003)). The Court takes Richardson's claims in turn.

## I. Ineffective Assistance

Respondent contends that summary judgment is proper on Richardson's ineffective assistance claim because: (1) it was procedurally defaulted; and (2) it fails on the merits.

## A.    Procedural default

At the outset, Respondent argues that Richardson procedurally defaulted all but his contention that Brown was ineffective for failing to have him evaluated by a psychologist prior to his suppression hearing, and that summary judgment is proper because Richardson no longer disputes that such an evaluation occurred.

As this Court previously explained, a federal district court may not grant a writ of habeas corpus unless the petitioner exhausted his state court remedies by presenting his claim's "operative facts" and "controlling legal principles" before the state courts, because only then do the state courts have "a meaningful opportunity to pass upon the substance of the claim[ ]." *Chambers v. McCaughtry*, 264 F.3d 732, 737-38 (7th Cir. 2001); 28 U.S.C. § 2254(b)(1)(A). But courts are to "avoid hypertechnicality" when applying this standard. *Chambers*, 264 F.3d at 738 (quoting *Verdin v. O'Leary*, 972 F.2d 1467, 1474 (7th Cir. 1992)). Indeed, "mere variations in the same claim . . . will not preclude exhaustion," and a petitioner may even "reformulate his claims" in his federal habeas petition provided "the substance of the argument remains the same." *Id.* (citing *Wilks v. Israel*, 627 F.2d 32, 38 (7th Cir. 1980)).

Respondent is correct that Richardson's petition falls flat to the extent it is based on Brown's supposed failure to procure a psychological evaluation; there is now no dispute that such an evaluation occurred. But the problem for Respondent is that the Court already rejected Respondent's argument that Richardson's claim is that narrow. Indeed, the Court held that Richardson's post-conviction petition PLA

argument that Brown's alleged failure to have him evaluated for his ability to understand *Miranda* warnings and his federal habeas claim contesting Brown's failure to present evidence of his mental capacity "were 'variations in the same claim' arising out of the same 'operative facts.'" Equitable Tolling Order at 43-44.

Respondent also argues that Richardson's ineffective assistance claim is barred by Section 2254(e)(2)(A)(ii), because it requires the Court to consider "new evidence" not presented to the state courts.[4] R. 102 at 15. It is the unusual case in which the petitioner is "allowed to conduct additional discovery and to supplement the record with deposition testimony relevant to his claims." *Tabb v. Christianson*, 855 F.3d 757, 765 (7th Cir. 2017); *see also id.* at 764-65 (noting that "[a]s a general rule, federal habeas petitions must be decided on state court records," and "[t]o obtain discovery, the federal petitioner must '(1) make a colorable claim showing that the underlying facts, if proven, constitute a constitutional violation; and (2) show 'good

---

[4] 2254(e)(2) provides:

> If the applicant has failed to develop the factual basis of a claim in State court proceedings, the court shall not hold an evidentiary hearing on the claim unless the applicant shows that—
>
> (A) the claim relies on—
>
> > (i) a new rule of constitutional law, made retroactive to cases on collateral review by the Supreme Court, that was previously unavailable; or
> >
> > (ii) a factual predicate that could not have been previously discovered through the exercise of due diligence; and
>
> (B) the facts underlying the claim would be sufficient to establish by clear and convincing evidence that but for constitutional error, no reasonable factfinder would have found the applicant guilty of the underlying offense.

cause' for the discovery") (citing *Hubanks v. Frank*, 392 F.3d 926, 933 (7th Cir. 2004) and 28 U.S.C. § 2254(e)(2)). But the Court already decided that this is such a case, and not only did Respondent fail until now to raise this argument, but also it was *Respondent* that suggested the discovery at issue in the first place. *See* R. 26 at 19 n.4. The Court therefore proceeds to the merits, and considers the entire record.[5]

## B.    Merits

On habeas review, a petitioner claiming ineffective assistance must show that the state court unreasonably applied the standard for ineffective assistance set forth by the Supreme Court in *Strickland v. Washington*, 466 U.S. 668 (1984). That standard asks: (1) whether counsel provided representation that "fell below an objective standard of reasonableness" (performance prong); and (2) whether "there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different" (prejudice prong). *Strickland*, 466 U.S. at 688, 694. A petitioner must establish both prongs to succeed on his claim. *Gage v. Richardson*, 978 F.3d 522, 527 (7th Cir. 2020). Analysis of *Strickland*'s performance prong begins with "a strong presumption that counsel's conduct falls within the wide range of reasonable professional assistance." *Strickland*, 466 U.S. at 689. In turn,

---

[5] Respondent also argues that Richardson's "reformulated claims" based on trial counsel's failure to introduce any evidence of Richardson's mental deficiencies are inconsistent with his claim that Brown failed to have a psychological evaluation conducted in the first place. Respondent suggests that Richardson knowingly misrepresented to this Court and the state courts before it that no such evaluation occurred. But because as discussed *infra* Richardson's petition fails on its merits, the Court need not consider whether this accusation provides a separate basis upon which to deny his petition.

*Strickland*'s prejudice prong "asks whether it is 'reasonably likely' the result [of the trial] would have been different" but for counsel's unprofessional errors; in other words, a petitioner must show that the likelihood of a different result is "substantial, not just conceivable." *Harrington*, 562 U.S. at 111-12 (quoting *Strickland*, 466 U.S. at 696). Because the *Strickland* standard is "highly deferential" to a lawyer's strategic choices and the review of state court judgments under Section 2254(d) is "likewise highly deferential," the Court's review is "doubly deferential." *Hinesley v. Knight*, 837 F.3d 721, 732 (7th Cir. 2016). Indeed, "[s]urmounting *Strickland*'s high bar is never an easy task." *Padilla v. Kentucky*, 559 U.S. 356, 371 (2010). And when Section 2254(d) applies, the task is even more difficult, because the question is "not whether counsel's actions were reasonable," but rather "whether there is *any* reasonable argument that counsel satisfied *Strickland's* deferential standard." *Harrington v. Richter*, 562 U.S. 86, 105 (2011) (emphasis added).

As discussed above, in rejecting Richardson's post-conviction petition, the Illinois appellate court assumed without determining as a factual matter that Richardson was evaluated and that the evaluator reached conclusions that were not helpful to him. From there, it concluded that counsel's performance was not deficient. *Richardson V*, 30 N.E.3d at 346. This was unreasonable. *See Wiggins v. Smith*, 539 U.S. 510, 527-28 (2003) (finding state court's *Strickland* analysis unreasonable because it assumed that counsel's decision not to investigate further was reasonable without actually assessing counsel's decision to stop investigating when they did). Moreover, the state court decided the prejudice prong based on evidence that

Richardson in fact caused Diamond's death. But the issue has always been whether Richardson acted with the requisite *intent* for first degree murder *when* he caused Diamond's death, not whether he caused it in the first place. In sum, the state court unreasonably applied *Strickland* in resolving Richardson's post-conviction claims.

But that Richardson has satisfied the Section 2254(d) inquiry does not necessarily mean that he is entitled to habeas relief. *See Mosley v. Atchison*, 689 F.3d 838, 853 (7th Cir. 2012) ("Whether the petitioner is actually entitled to relief— whether under § 2254(a) he is in custody in violation of the Constitution or laws or treaties of the United States—is a separate question" from whether he satisfied Section 2254(d)). Richardson still must prove that his counsel was ineffective as a factual matter. *See Campbell v. Reardon*, 780 F.3d 752, 756-57 (7th Cir. 2015) (state court unreasonably applied *Strickland* in rejecting petitioner's ineffective assistance claim "without ever addressing key factual questions," but "further proceedings to determine the actual facts" were necessary to resolve whether petitioner was entitled to habeas relief); *see also Stitts v. Wilson*, 713 F.3d 887, 889-90 (7th Cir. 2013) (state court unreasonably applied *Strickland* by assuming "[w]ithout explicitly determining" that trial counsel's alibi investigation was limited to a single interview and that such a limited investigation was sufficient under *Strickland*, but a remand was necessary to "resolve the critical factual question concerning the actual extent" of the investigation). As explained below, he cannot.

Richardson complains about the scope of trial counsel's investigation into his mental deficiencies, as well as her decision not to call Dr. Zoot or any other witness

to the stand at the suppression hearing or trial to testify about the same. Respondent counters that Brown's investigation was "clearly adequate" and her strategic decision not to call Dr. Zoot or another witness was "certainly reasonable," because Dr. Zoot's "ultimate conclusions contradicted the arguments Brown intended to make at the suppression hearing and at trial." R. 102 at 20-21. The Court agrees that Richardson cannot meet *Strickland's* high bar.

Generally, "[i]f counsel has investigated witnesses and consciously decided not to call them, the decision is probably strategic," and if that call was made after a thorough investigation of law and facts, it is "virtually unchallengeable." *Blackmon v. Williams*, 823 F.3d 1088, 1103 (7th Cir. 2016) (quoting *United States v. Best*, 426 F.3d 937, 945 (7th Cir. 2005) and *Strickland*, 466 U.S. at 690). But even "[s]trategic choices made after less than complete investigation" are reasonable, provided "that reasonable professional judgments support the limitations." *Wiggins*, 539 U.S. at 533 (internal quotations omitted).

Brown's decision not to call Dr. Zoot was reasonable. While at first blush some of Dr. Zoot's conclusions as recorded by Brown appear helpful—including that Richardson is "very limited," and that his deficits could provide "some mitigation" of his culpability at trial—those comments cannot be read in a vacuum. Indeed, Dr. Zoot's opinions on the whole were plainly more damaging than helpful. The only reasonable takeaway from Brown's notes was that Dr. Zoot had concluded that Richardson was exaggerating his deficiencies, and his actual deficiencies were not so extreme that they affected his ability to comprehend *Miranda* or the consequences of

his actions. *See* R. 101, Ex. 1 at 188-89, 222-23 (concluding that Richardson had "enough experience and enough intellectual ability to knowingly waive" his *Miranda* rights, "was not so intellectually limited that he didn't know what he was doing," and that his deficits did not prevent him from "know[ing] his acts created a strong probability of death or great bodily harm").

Richardson also complains that Dr. Zoot's evaluation was cursory, comparing the three-and-a-half hours she spent on Richardson's evaluation to the estimated 20-30 hours she anticipated spending on his case. But this argument ignores that Dr. Zoot spent eight hours and forty minutes on the case in total, and that her initial estimate included the time necessary to write a report and prepare for and attend trial—none of which occurred here. Furthermore, and despite Richardson's urging otherwise, nor does the Court fault Brown for the fact that Dr. Zoot did not conduct a second interview with Richardson. As discussed, Brown *did* speak to Dr. Zoot about that possibility, but Dr. Zoot said her impressions would not change. It is a "rare case where counsel's conscious decision not to call a witness would amount to constitutionally ineffective assistance." *United States v. Weaver*, 882 F.2d 1128, 1139 (7th Cir. 1989). This is not it.

Brown also was not ineffective for failing to (1) engage a second expert, or (2) consult and present a fact witness on Richardson's mental deficiencies as Richardson asserts. Trial counsel "need only investigate possible lines of defense and make an informed decision." *Blackmon*, 823 F.3d at 1103. Put another way, "counsel has a duty to make reasonable investigations *or* to make a reasonable decision that makes

21

particular investigations unnecessary." *Strickland*, 466 U.S. at 691 (emphasis added). Brown satisfied that duty by consulting with Dr. Zoot on multiple occasions and considering her conclusions, asking Dr. Zoot to evaluate Richardson again, talking to Richardson's mother and brother, and reviewing CPS and other relevant records. She then determined from all of this that it would be best not to put Richardson's mental deficits directly at issue. *Cf. Frentz v. Brown*, 876 F.3d 285, 294 (7th Cir. 2017) (ineffective assistance claim failed where "[f]or all the evidence on the record, counsel may well have consulted further with [the first expert], spoken with his client more, or asked [the first expert] to speak with [petitioner] again, and determined . . . that an insanity defense would be unavailing."). This was not unreasonable, nor was it unreasonable to limit her investigation as she did. In fact, while Richardson points to the conclusions of Dr. Erick Neu, who evaluated Richardson after trial and opined that Richardson "appear[ed] to fall in the upper echelon" of mild mental retardation and demonstrated an IQ of just 61, Dr. Neu's evaluation also showed that Richardson was fit for sentencing, and that his impairments were "not so severe as to compromise [his] ability to understand the nature and purpose of the proceedings." R. 101, Ex. 2 at 68-69. Dr. Neu also concluded that his assessment "appear[ed] to provide a slight underestimate" of Richardson's "current intellectual functioning." *Id.* It was therefore sensible to assume that another expert would draw similar conclusions to Dr. Zoot's. And Richardson offers no expert testimony to the contrary. *See Frentz*, 876 F.3d at 294 (failure to engage a second expert to present insanity defense did not support ineffective assistance claim

22

where petitioner offered no evidence that "it was or should have been evident . . . that an insanity defense would have been meritorious").

Further, Brown explained that her decision not to call a fact witness to testify to Richardson's mental limitations was because she had determined that: (1) without an expert, she likely could not successfully tie Richardson's deficits to the ultimate legal issues at the suppression hearing (or trial); (2) introducing a fact witness would open the door to damaging rebuttal from the State; and (3) she had other evidence to support suppression, including the police assault on Richardson, and his videotaped confession and in-court testimony, from which Brown believed the jury could discern his deficits.

These conclusions are certainly rational, yet Richardson asks the Court to discount them, pointing to Brown's seemingly conflicting deposition testimony that she could not "even tell you the exact strategy in my mind at the time." Richardson argues that Brown's proffered reasons therefore amount to "post-hoc rationalizations" and "self-serving statements" that are unworthy of credence.[6] R. 114 at 27-28, 33-34. But even if Brown's proffered reasons are mere assumptions about her strategy at the time, such a failure of memory and evidence cuts against the relief Richardson requests, not in favor of it. *See Burt v. Titlow*, 571 U.S. 12, 15 (2013) (federal courts may not "so casually second-guess the decisions of . . . defense attorneys" by "assuming that counsel was ineffective where the record was silent"). Indeed, it would

---

[6] Richardson also argues that Brown gave these reasons only in response to leading questions. R. 114 at 33. But Brown provided them in response to questions from counsel for Richardson, not Respondent. *See, e.g.*, R. 101, Ex. 1 at 140-144, 147-157.

be error to "dismiss[ ] strategic considerations like these as an inaccurate account of counsel's actual thinking," because *Strickland* "calls for an inquiry into the *objective* reasonableness of counsel's performance, not counsel's subjective state of mind." *Harrington*, 562 U.S. at 110 (emphasis added); *see also id.* at 109 (courts are not permitted to "insist counsel confirm every aspect of the strategic basis for his or her actions").

Richardson also complains about Brown's failure to investigate certain fact witnesses—including the individuals who contributed to his CPS records, and his sister and a former teacher as his brother Troy Gaston suggested. But *Strickland* does not charge trial counsel with leaving no stone unturned or "present[ing] each and every witness that is suggested to [her]." *Berg*, 714 F.3d at 499. Nor is it enough to simply complain about witnesses trial counsel failed to contact. *United States v. Ashimi*, 932 F.2d 643, 650 (7th Cir. 1991) (defendant cannot "simply state that the testimony would have been favorable; self-serving speculation will not sustain an ineffective assistance claim"). Instead, the petitioner must make "a comprehensive showing as to what the [additional] investigation would have produced." *Hardamon v. United States*, 319 F.3d 943, 951 (7th Cir. 2003). Such a showing typically involves presenting "*actual testimony* by the witness or an affidavit." *Ashimi*, 932 F.2d at 650 (emphasis added); *see also Cross v. DeRobertis*, 811 F.2d 1008, 1016 (7th Cir. 1987) ("When the allegation of the ineffectiveness of counsel centers on a supposed failure to investigate, we cannot see how . . . the petitioner's obligation can be met without a comprehensive showing as to what the investigation would have produced," which,

24

"[u]nder usual circumstances, . . . would be presented to the habeas court through the testimony of the potential witnesses").[7] Richardson presents no witnesses or affidavits, nor has he sought permission to do so. And even assuming the individuals who contributed to his CPS records would testify in accord with their contents or that the records could be admitted without a witness as Richardson contends, the Court cannot second-guess trial counsel's conclusion that introducing them without expert testimony might have done more harm than good.[8] *See Harrington*, 562 U.S. at 108

---

[7] Richardson cites several cases in support of his argument that Brown's investigation was lacking. But all are distinguishable, including because none involved unfavorable and uncontroverted expert evidence on the ultimate issues. *See Williams v. Taylor*, 529 U.S. 362, 370-71, 373 (2000) (trial counsel ineffective who misunderstood state law and failed to return key witness's call was ineffective for failing to introduce critical evidence later presented by petitioner); *Wiggins v. Smith*, 539 U.S. 510, 516-17, 524-25 (2003) (trial counsel ineffective where failed to have a social history report prepared for petitioner despite that doing so was standard practice, and petitioner presented favorable social history report from his own expert); *Andrus v. Texas*, 140 S. Ct. 1875 (2020) (trial counsel ineffective where he "not only neglected to present [mitigating evidence]; he failed even to look for it"); *Porter v. McCollum*, 558 U.S. 30, 33-36 (2009) (trial counsel ineffective where petitioner presented several expert and fact witnesses who testified to "extensive mitigating evidence, all of which was apparently unknown" to counsel); *Brown v. Sternes*, 304 F.3d 677, 687-89 (7th Cir. 2002) (trial counsel ineffective where petitioner presented "mountain of evidence" that he was unfit for trial, including a new report prepared by a retained expert, and trial counsel's affidavits contradicted counsel's earlier representations); *Brewer v. Aiken*, 935 F.2d 850, 852, 858, n.1 (7th Cir. 1991) (trial counsel rendered ineffective assistance by spending just "a couple of hours" preparing for guilt phase of death penalty trial and therefore having never learned of petitioner's low IQ, mental deficits, or disadvantaged childhood).

[8] Richardson also points to Ross's deposition testimony that if an expert did not give a favorable opinion on the ultimate issue in a given case, she would call a fact witness like the defendant's mother to "talk about [the defendant's] mental state, his upbringing, his schooling" as evidence that these facts should have been introduced in some way in his own case. R. 114 at 25 (quoting R. 101, Ex. 3 at 25-26). But Ross served as second chair in Richardson's case, had almost no recollection of the case, and as a result was speaking in generalities. Further, *Strickland* counsels that: (1) "[t]here are countless ways to provide effective assistance in any given case;" and (2)

("An attorney need not pursue an investigation that would be fruitless, much less one that might be harmful to the defense.").

Brown's strategy did not pan out. But it was not pre-ordained for failure. Indeed, the jury asked whether it could convict Richardson of a lesser offense, suggesting that Richardson's testimony and videotaped confession raised some question in their minds regarding his culpability, just as counsel had hoped.

"It is all too tempting for a defendant to second-guess counsel's assistance after conviction or adverse sentence, and it is all too easy for a court, examining counsel's defense after it has proved unsuccessful, to conclude that a particular act or omission . . . was unreasonable." *Strickland*, 466 U.S. at 689. But that is not permitted. *See Harrington*, 562 U.S. at 107 ("Reliance on the harsh light of hindsight to cast doubt on a trial that took place now more than 15 years ago is precisely what *Strickland* and AEDPA seek to prevent."); *see also Strickland*, 466 U.S. at 689 ("A fair assessment of attorney performance requires that every effort be made to eliminate the distorting effects of hindsight, to reconstruct the circumstances of counsel's challenged conduct, and to evaluate the conduct from counsel's perspective at the time."). Instead, "[t]he question is whether [trial counsel's] representation amounted to incompetence under 'prevailing professional norms,' not whether it deviated from best practices or most common custom." *Harrington*, 562 U.S. at 105. Richardson cannot make the requisite showing.

---

"[e]ven the best criminal defense attorneys would not defend a particular client in the same way." 466 U.S. at 689.

## B.     Involuntary Confession

Richardson also asserts that the Illinois Supreme Court unreasonably applied clearly established federal law to find that his confessions were voluntary. Involuntary confessions are prohibited as evidence in a criminal prosecution by the Due Process Clause of the Fourteenth Amendment. *Dassey v. Dittmann*, 877 F.3d 297, 303 (7th Cir. 2017) (citing *Miller v. Fenton*, 474 U.S. 104, 109 (1985)). As this Court previously explained, a confession is voluntary "if, in the totality of circumstances, it is the product of a rational intellect and free will and not the result of physical abuse, psychological intimidation, or deceptive interrogation tactics that have overcome the defendant's free will." *Carrion v. Butler*, 835 F.3d 764, 775 (7th Cir. 2016) (quoting *United States v. Gillaum*, 372 F.3d 848, 856 (7th Cir. 2004) (internal quotation marks omitted)). In determining whether a confession is voluntary, a court reviews "both the characteristics of the accused and the details of the interrogation." *Schneckloth*, 412 U.S. at 226. And it considers special factors for juvenile defendants, including the "juvenile's age, experience, education, background, and intelligence, . . . whether he has the capacity to understand the warnings given him, the nature of his Fifth Amendment rights, and the consequences of waiving those rights." *Fare v. Michael C.*, 442 U.S. 707, 725 (1979).

This Court concluded in its Equitable Tolling Order that the Illinois Supreme Court applied the correct "totality of circumstances" test and reasonably applied United States Supreme Court precedent to find that Richardson's confessions were voluntary based on the evidence then before it. R. 61 at 53. And while the Court

considered the possibility that Richardson's involuntary confession claim may yet remain viable if Richardson was able to demonstrate that his trial counsel rendered ineffective assistance, as discussed above, he was not able to do so. Accordingly, summary judgment is also proper on this claim.

*    *    *    *    *

Ultimately, the state court in Richardson's post-conviction proceedings assumed correctly that given Brown's repeated requests for continuances, "Richardson was, in fact, evaluated and the evaluator reached conclusions not helpful to Richardson," thus "readily explaining" the lack of evidence of his mental deficits at the suppression hearing (and trial). There is insufficient evidence from which to conclude that counsel's failure to present information regarding Richardson's deficits at that hearing or at trial was due to counsel's "inattention" as opposed to "reasoned strategic judgment." *Cf. Wiggins*, 539 U.S. at 534. Accordingly, Richardson cannot meet his burden to demonstrate that trial counsel's performance was unreasonable, and summary judgment is proper for Respondent on both of Richardson's claims.

## III.    Certificate of Appealability

When a district court enters a judgment on a habeas petition, it must also grant or deny a certificate of appealability. 28 U.S.C. § 2253(c). Such a certificate is warranted when a petition makes "a substantial showing of the denial of a constitutional right," *Id.* § 2253(c)(2), or when the petitioner demonstrates that "reasonable jurists would find the district court's assessment of the constitutional claims debatable or wrong." *Slack v. McDaniel*, 529 U.S. 473, 484 (2000). This

28

standard is not insurmountable. "Many prisoners who seem likely to lose in the court of appeals nonetheless are entitled to certificates of appealability under the statutory standard; meritorious appeals are a subset of those in which a certificate should issue." *Thomas v. United States*, 328 F.3d 305, 308 (7th Cir. 2003); *see also Miller-El v. Cockrell*, 537 U.S. 322, 336-37 (2003) (a petitioner need not make a "showing that the appeal will succeed" to obtain a certificate of appealability). Although this Court ultimately found Richardson's arguments unpersuasive, reasonable jurists could disagree with the Court's conclusion that the scope of trial counsel's investigation into Richardson's mental impairments was reasonable. Richardson therefore meets the standard for a certificate of appealability, and, given the potential impact that determination has on not only Richardson's ineffective assistance claim, but also his involuntary confession claim, a certificate will issue as to both.

## Conclusion

For the foregoing reasons, Respondent's motion for summary judgment, R. 94, is granted, and Richardson's petition for habeas corpus, R. 24, is denied, but a certificate of appealability shall issue on both of his habeas claims. This civil case is terminated. The Court thanks counsel of record for their outstanding work in this case, and in particular appointed counsel for Richardson—Russell D. Mangas, Sean M. Berkowitz, Amy R. Gore, and Kathleen R. Elsner, each of Latham & Watkins LLP while assigned to this case—who so ably and diligently worked to bring the relevant facts to light and to advocate for their client's interests throughout this litigation.

ENTERED:

_____
Honorable Thomas M. Durkin
United States District Judge

Dated: September 17, 2021